BARNES v. BEE et al.

(Circuit Court, N. D. West Virginia. June 13, 1905.)

1. TAXATION—ASSESSMENT—UNDIVIDED INTEREST—PAYMENT OF TAXES.

Two tracts of land consisting of 69½ and 2½ acres, respectively, as to which the owner had sold an undivided one-sixteenth interest in all oil, gas, and other mineral substances in and under the same, were assessed as a whole to such owner at $6.50 per acre, but the valuation was erroneously set down as $425 and $15, respectively, instead of $451.75 and $16.25; the levies being properly extended on the true valuation. The same mistakes as to the total valuations of the tracts were made from year to year thereafter until a reassessment was made, when the officer neglected to extend the levies on the true valuation, but extended them on the erroneous valuation carried over from the book of the preceding year, prior to which the grantee of the mineral interest had conveyed one-half of such interest to B., who was assessed independently on his undivided interest. *Held*, that the intention was to assess the full taxes on the full valuation of the entire property to the original owner, and, she having paid the amount assessed, the assessment against B. was void.

**2. SAME—UNDIVIDED INTEREST—ASSESSMENT—STATUTES.**

Code W. Va. 1899, c. 29, § 25, provides that, where a tract or lot of land becomes the property of different owners in several parcels, and one person becomes the owner of the surface and another of the minerals under the same, or of the timber alone on the land, the assessor shall divide the value at which the whole had before been assessed among the different owners, having regard to the value of each interest compared with that of the whole, and Code 1899, c. 29, § 37, and Acts 1905, p. 303, c. 35, § 49, requires that the "tract" be assessed in the name of the person who by himself or his tenant has the freehold in possession. *Held,* that where the owner of certain land conveyed merely an undivided one-sixteenth part of all oil, gas, or other mineral substances in and under the same, the grantees of such undivided interest did not hold by a complete and separate title, and hence their interest was not subject to a separate assessment for taxes as an undivided interest "in oil, gas, and other mineral substances."

**3. TAX SALES—DEEDS—VACATION—TENDER.**

Where a tax deed was set aside as absolutely void under a sale unauthorized by law, the owner was not required to pay the tax purchaser his outlay under Code 1899, c. 31, § 25, requiring such payment as a condition precedent to the vacation of a tax deed for irregularities in the proceedings.

**4. SAME—COSTS.**

Where, in a suit to set aside a tax deed, it was determined that the deed was absolutely void on the ground that the property was not subject to the assessment in question, the assessment having been made by the negligence of the state's officers, costs would not be allowed to either party.

In Equity.

Van Winkle & Ambler and Merrick & Smith, for plaintiff.

George W. Johnson and T. P. Jacobs, for defendant.

DAYTON, District Judge. John H. Kelley and Clara V. Kelley, on March 29, 1898, by deed which was admitted to record April 2, 1898, conveyed to plaintiff, Barnes, a citizen of Ohio, "one-sixteenth part of all oil and gas and other mineral substances in and under" two parcels of 69½ and 2½ acres of land, situate in Ritchie county, this state, fully described in the deed by metes and bounds, for the consideration expressed of $2,000 cash. By deed of September 21, 1898, recorded September 24, 1898, Barnes conveyed a half of this, or $1/32$ interest in all, to Mallory Bros., but they subsequently by deed dated March 29, 1903, reconveyed back this interest to Barnes. The surface and remaining $15/16$ undivided interest of the "oil, gas, and other mineral substances" remained vested in Mrs. Kelley. On the landbooks of Ritchie county, Mrs. Kelley, for the year 1898, was assessed with these two tracts separately as 69½ acres and 2½ acres in fee, as situate on "Wts of Bond Creek," northeast 9 miles from courthouse, valued each at $6.50 per acre, and a total valuation of $425 for the 69½ acres, instead of $451.75, the true total at that rate, and for the 2½-acre tract of $15, instead of $16.25, the true valuation at that rate. She was assessed for state purposes on the 69½ acres at the rate of 25 cents on the $100, the sum of $1.13, the full amount due on the true valuation, 6¾ cents more than due on the valuation given; 45 cents for state school purposes, at a rate of 10 cents, the correct amount on the

true valuation, 2½ cents too much on the valuation given; $1.81 for county purposes, at a rate of 40 cents, the correct amount on the true valuation, 11 cents too much on the valuation given; $2.26 for road purposes and teachers' fund, respectively, each at the rate of 50 cents, the right amount on the true valuation, 12½ cents too much on each for the valuation given; and $1.36 for building fund at a rate of 30 cents, the correct amount on the true valuation, 8½ cents too much on the valuation given. The 2½-acre tract also shows that, while the valuation was fixed at $15, instead of $16.25, the taxes were assessed upon the true valuation, and not the valuation given. These tracts had been acquired by Mrs. Kelley by different deeds from different parties. In pencil, on the assessment book, just after Mrs. Kelley's name, is written, "1–16 oil reserve to G. W. Barnes;" but the plaintiff, although his deed bore date two days before April 1st, the assessment date fixed by law, was not assessed in any manner for that year on account of his $1/16$ undivided interest in the "oil, gas, and other mineral substances in and under" said two parcels of land. For the year 1899 Mrs. Kelley is assessed with these same two tracts separately, as having title in fee, and the same location, bearing, and distance from the courthouse are given, as also the same valuation of $6.50 per acre each, and the same erroneous total valuations of $425 and $15, respectively. This year, however, she was not assessed at the given rates upon the true total valuation, as was the case in the preceding year, but upon the false total valuations given for both years. In this last year, following her name, in parenthesis, are the words, "Less $1/16$ oil, &c." For this year 1899, when, by the records, Mrs. Kelley was shown to be vested with fee-simple title in the surface of and in $15/16$ undivided interest in the "oil, gas, and other mineral substances in and under" these two tracts and $1/32$ of the latter, undivided, was in plaintiff, Barnes, and the remaining $1/32$ thereof was in Mallory Bros., the said Mallory Bros. were assessed with nothing, so far as shown, because of their interest, but plaintiff, Barnes, was assessed with "1–16 oil, etc., reserve" in 72 acres, claimed now to be the 69½ and 2½ acre tracts consolidated, at the rate of 50 cents per acre, or a total valuation of $36, upon which taxes amounting to 78 cents in all, according to the fixed rates, were charged. These taxes were not paid by Barnes, by reason of which this interest was returned delinquent, and sold by the sheriff January 13, 1902, and purchased by defendant Bee, who paid a total for taxes and expenses of $2.35, and on the 16th day of January, 1903, had a surveyor's report made, and on January 19, 1903, received from the clerk of the county court a deed therefor, which surveyor's report and deed was on said last day admitted to record. It is to be noted that neither the report nor deed bound the 72 acres as a single tract, but simply copy the metes and bounds of the 69½ and 2½ acres, respectively, apparently from the deed of Kelley and wife to Barnes, to which both refer. Meanwhile, on the 20th day of October, 1902, Kelley and wife and Barnes made a lease, in which Mallory Bros., did not join, to Upham & Rolston, whereby they granted the lessees all the oil and gas in and under these lands de-

scribed as 70 acres, and described generally by reference to the abutting owners, for the period of two years upon usual terms for the payment of one-eighth royalties and other conditions not necessary to set forth. This lease was assigned by the lessees to Sarber Bros. & Co., and on January 14, 1903, the lease and assignment were together admitted to record. A valuable 200-barrel oil well resulted, and this one-sixteenth undivided interest became of value estimated at from $5,000 to $6,000. Defendant Bee insisted upon his being the owner of the interest under his tax deed, refused to surrender his claim; hence this suit brought to set aside said tax deed as a cloud upon his title, and the appointment of a receiver herein, to whom has been paid over the proceeds arising from the sale of oil due to this interest.

Casting aside all minor and technical objections, the grounds set forth and insisted upon as the basis for this relief may be reduced to three: First. Because of errors and variances apparent on the face of the tax record. Second. Because the whole property, including the one-sixteenth undivided interest in the "oil, gas, and other mineral substances" sold, was, for the year in question—1899—assessed to Mrs. Kelley, and all taxes due thereon were paid by her. Third. Because the assessment of the one-sixteenth undivided interest in the "oil, gas, and other mineral substances" was wholly unauthorized by law, and therefore void, and, in consequence, no sale could be made thereof, and no title thereto secured thereby.

Taking up the first ground, it may be noted that the following objections may be urged to the tax record: (a) The description given in the assessment as "1–16 oil, &c., reserve," was wholly misleading. Barnes had not "reserved" any such interest in 72 acres, or, so far as shown, in any other tract. He had sold no land then in which to "reserve" anything. (b) The assessment of such interest in 72 acres was misleading. He never had owned such interest in a single tract of 72 acres, but had purchased said interest in two distinct and separate tracts of 69½ acres and 2½ acres, which had theretofore been, and were that year, assessed as separate tracts to Mrs. Kelley; and he had made no request for, and had no knowledge of, any consolidation. (c) The assessment to him of a one-sixteenth interest was erroneous and misleading, for on the 1st day of April, 1899, the assessment date, he had no one-sixteenth interest in a 72-acre tract, nor in the 69½ and 2½ acre tracts, which could be consolidated into such. He had sold one-half of a sixteenth interest in the parcels in September, 1898, to Mallory Bros. by deed which had been duly recorded, and knowledge of, by statute, was expressly required to be taken by the assessment officers. It is insisted that Barnes had right to presume that officers would discharge their duty in this behalf, and that, if he was assessable at all upon an undivided interest by the action of the assessment officers, he would be so assessed upon the true interest owned by him as disclosed by the record, and not upon a wholly different interest. (d) Both the delinquent and sale returns vary wholly from the assessment. These returns show Barnes to be returned delinquent

on 72 acres, qualified before his name by the letters "M. R." under title "Estate Held," and the sale return shows that said 72 acres with such "M. R." estate held therein by Barnes were sold, and purchased by Bee. The letters "M. R." are explained to mean "Mineral Right." It is insisted that the whole mineral right in the 72 acres was therefore returned delinquent and sold in the name of Barnes, who never had had more than a sixteenth undivided interest in such mineral, and in fact had at the time only an undivided thirty-second interest. (e) Both the surveyor's report and the deed varied from the assessment, the delinquent and the sale returns touching the description of the tracts, and the interest therein sold.

There would be no difficulty in this matter had this tax sale and conveyance been made prior to the year 1882, but on the 24th of March of that year (chapter 130, p. 387, Acts 1882) the Legislature enacted what is now section 25 of chapter 31 of the Code of West Virginia of 1899, making sweeping changes in the law as then existing. The purpose and object of this section is very clear. It manifestly was designed, as Brannon, J., expresses it in Winning v. Eakin, 44 W. Va. 19, 28 S. E. 757, "to render these tax sales efficient to collect delinquent taxes, and to confer upon the purchaser a substance, and not a shadow." Changing the former law as contained in chapter 117, p. 308, Acts 1872–73, which provided a tax deed should not be set aside except for irregularity apparent on the face of the proceedings, and of character such as "materially to prejudice the rights of the owner whose real estate is sold," it enacted such tax deed should not be set aside unless the "irregularity appear on the face of such proceedings of record in the office of the clerk of the county court, and be such as materially to prejudice and mislead the owner of the real estate so sold, as to what portion of his real estate was sold, and when and for what years it was sold, or the name of the purchaser thereof; and not then, unless it be clearly proved to the court or jury trying the case, that but for such irregularity, the former owner of such real estate would have redeemed the same." Not content with this, it proceeds at great length to exclude in detail the consideration of almost every such material and prejudicial irregularity that could be conceived of that might possibly come within the scope of the already very restricted exception. For example:

"No irregularity, error or mistake in the delinquent list, or the return thereof, or in the affidavit thereto, or in the list of sales filed with the clerk of the county court, or in the affidavit thereto, or in the recordation of such list or affidavit or as to the manner of laying off any real estate so sold, or in the plat, description or report thereof, made by the surveyor, or other person," shall invalidate the sale and deed. Again: "But no sale or deed of any such real estate under the provisions of this chapter shall be set aside, or in any manner effected by reason of the failure of any officer mentioned in this chapter to do or perform any act or duty herein required to be done or performed by him after such sale is made, or by the illegal or defective performance or attempt at the performance of any such act or duty after such sale, or by reason of the conveyance by the deed hereinbefore mentioned and prescribed, of a less quantity of real estate than that mentioned in the list of sales made out and returned as provided in the twelfth, thirteenth and four-

teenth sections of this. chapter, if the real estate so conveyed by such deed, be in fact, the same which was sold as delinquent."

The wisdom, not to say the honesty, of such legislation, may well be doubted. When the people elect men to offices strenuously sought for by them, require them to take oaths properly to perform their duties, they may reasonably expect them to perform such duties honestly, legally, and accurately. If they do not by reason of either negligence or incompetency, they ought to be either made to suffer for the one or be removed for the other. This sweeping condonation and practical legalization of their illegal negligent acts, their criminal carelessness in fact, cannot be justified by saying the state and county must be secured in their revenue, a considerable part of which is collected for the very purpose of paying these officers' salaries; and this is especially so when the gross carelessness and illegal actions tend to involve taxpayers living miles away, frequently in other counties and other states, in a penalty loss, often of thousands of dollars of property, because the state would otherwise lose, or be delayed in the collection of, a few paltry cents of its revenue. To say that these sworn officers can perform their duties erroneously, irregularly, negligently, corruptly, illegally, and yet the citizen shall suffer all the consequences of this conduct on the part of the state's agents to the extent of the loss of his property, sounds more like practical confiscation than taking property by "due process of law." The courts have to enforce such legislation, but they are not restrained from expressing their condemnation of it, and in equity may construe it strictly under the well-settled principle that equity abhors penalties.

The Supreme Court of Appeals of West Virginia has gone a long way in upholding this statute in its broadest scope. They have held in State v. McEldowney, 47 S. E. 650, that the return of the delinquent list to a term other than the one required by law is cured by sale under this statute, and that these curative provisions apply to purchases by the state itself at tax sales; expressly overruling as to both points their prior decision in McGhee v. Sampselle, 47 W. Va. 352, 34 S. E. 815. Thus the state itself is to be permitted to enforce this penalty against the private citizen arising from the misconduct of its own agents or officers.

Again, in Hornage v. Imboden, 49 S. E. 1036, decided in February last, they hold failure to make out and swear to a list of land delinquent by the 1st of June, as required by section 18 of chapter 30 of the Code of 1899, failure to post a list of delinquent lands as required by section 18 of the same chapter, failure to present the delinquent list to the term of court required by section 21, the unwarranted action of the court upon these lists at a special term without notice published in the call for the special session of their purpose to do so, the fact that an affidavit to a list of sale contains no venue and does not show of what county the notary is a notary, are defects, violations of plain legal requirements in fact, held to be cured by this statute. Apparently there is one legal requirement governing these sales that has not been swept away by this amend-

ed section 25 and the Supreme Court of Appeals of the state in construing and enlarging its provisions. In Mosser v. Moore, 49 S. E. 537, decided in December last, it is held:

"A list of lands delinquent for taxes and a list of lands sold for taxes, giving no specification or description whatever of a tract or lot of land sold for taxes—utterly blank therein—are void, and render a tax sale of such tract and deed under it void; and such defect is not cured by section 25, c. 31, Code 1899."

Brannon, J., in this case decides that a delinquent list is actually required; that, if there is no delinquent list, the presumption arises that taxes have all been paid, and no lands are delinquent, and therefore none could be sold. Then he goes a step farther, and holds that in making these delinquent lists the officer ought not to simply return the name of the party and the amount of the taxes, thus: "Eliza E. McMillen, $18.14," but ought to give some description—some number of acres—(possibly any number would do), just some little something that might identify! And he thinks the same thing ought to be true about the sale list, notwithstanding the curative features of section 25. However, Dent, J., could not, it seems, go so far. It meant too much future labor for the state and county officials, perhaps, so he filed a dissenting opinion, valuable because it collates and cites the numerous cases decided by that court touching tax sales, in which he holds such delinquent and sale lists as Brannon, J., objects to, are all "cured" after sale and deed by the omnipotent section 25! It would require entirely too much time and space to consider the more than 30 other cases decided by the state court touching irregularities in these tax sales. Dent, J., in his dissenting opinion just referred to, points out a number that have been superseded by the change of the statute; others are in irreconcilable conflict with each other; while others have been expressly overruled. It is sufficient for me to say with the utmost respect and deference that I have no sympathy for the purposes and objects designed to be accomplished by this section 25, and I am constrained to think that the Supreme Court of the state has gone much too far in construing liberally, if not enlarging, its scope, instead of construing strictly its provisions as being contrary to common right and honesty. I fully appreciate the obligation upon federal judges to follow in a spirit of comity the courts of the state touching its statutes, and I will certainly discharge this obligation so far as possible; yet in view of the conflict and confusion existing in the state court's decisions, in this case, if it stood alone upon that point, I do not believe I would hesitate to set aside as void the sale and deed, notwithstanding section 25, because of the irregularities on the face of the proceedings materially prejudicing the owner Barnes "as to what portion of his real estate was sold," because an estate of "M. R.," which he never had, and which is undefined in the law, and would be unintelligible without explanation, was sold and conveyed to an extent of at least double the amount of interest he had in the two tracts at the time of the assessment, the delinquent and the sale return. If, as counsel for defendant contend, when Barnes took his conveyance he held thence adversely to the

world, then it would likewise be true that when Mallory Bros. took their conveyance from Barnes they likewise held adversely to all, and they had to be assessed with their interest as adverse. The officers could not ignore the one conveyance and take cognizance of the other. They could not, in my judgment, no matter how much aided by section 25, "make fish of one and fowl of the other." The solution of the other two questions involved, however, makes it unnecessary for me to assume this responsibility.

The second objection to the validity of this deed is because the whole property, including the sixteenth undivided interest held at the time by Barnes and Mallory Bros., was for the year in question —1899—assessed to Mrs. Kelley, and all taxes due thereon were paid by her. It is too well settled in this state to longer admit of doubt that the state is entitled to but one payment of taxes on lands held under one and the same title. A payment by one heir of the whole amount inures to the benefit of his coheirs; so, too, payment by the vendor inures to the benefit of his vendee, and a payment by one co-tenant or by one joint owner of the whole inures to the benefit of the other co-tenant or joint owners. Whitham v. Sayres, 9 W. Va. 671; Simpson v. Edmiston, 23 W. Va. 675; Bradley v. Ewart, 18 W. Va. 598; Gerke Brewing Co. v. St. Clair, 46 W. Va. 93, 33 S. E. 122. See, especially, the case of State v. Low, 46 W. Va. 451, 33 S. E. 271, an oil case very much in point. It is therefore a simple question of ascertaining whether all interests in these two tracts were assessed to and taxes paid by Mrs. Kelley for this year 1889. In the statement of the facts of the case I have pointed out the true situation. In 1898—the year previous—by the carelessness and mistake of the officer making out the assessment book, the total valuation of the 69½ acres assessed to Mrs. Kelley at $6.50 per acre was set down as $425, when it was in fact $451.75. The levies, however, were properly made and extended, based upon the true total valuation, and not upon that set down in the book. The same careless mistake was made in regard to the 2½-acre tract, incomprehensible as it may seem, where the total valuation was set down at $15, when in fact it was $16.25, and here, too, the levies at the proper rates were extended upon the true, and not the given, total valuation. It would be useless to try to determine how this mistake could be made in two items one after the other, yet a minute's calculation will show that it was done. In 1899 precisely the same mistakes were made as to the total valuations of the tracts, doubtless arising from the fact that the official copied mechanically the book of the year before, the matter to that point being unchangeable from year to year substantially so long as the ownership remained the same, until a new reassessment was made. This year, however, unlike the preceding one, he forgot entirely to extend the levies upon the true valuations, but did so upon the erroneous one which he had carried over and set down from the book of the preceding year. This is the exact situation, and by the error of their officer and agent the state, county, and district lost, all told, the sum of 55 cents of their taxes. Shall this error of the officer be made the excuse for the assessment to Barnes independently, upon

his undivided interest, of 78 cents taxes, for the nonpayment of which he is to lose property for which he paid $2,000, and which has developed a value of $5,000 or $6,000? I think not. I have not the slightest doubt that the true intention was to assess the full taxes upon the full valuation to Mrs. Kelley, and that if the state, county, and district lost the 55 cents it was solely through the fault and error of its agent and officer, to whom it should look alone for indemnity, notwithstanding the "curative" powers of said section 25. These taxes assessed were paid by Mrs. Kelley. There is no dispute about that. Therefore it is clear that such payment operated as payment on behalf of herself, Barnes, and Mallory Bros., who together owned at the time all the fee-simple title in the two tracts, including surface, "oil, gas, and other mineral substances." It follows, therefore that the separate assessment to Barnes was wholly unwarranted and erroneous; that the delinquent return and sale made to Bee were likewise unwarranted and illegal; and the tax deed based thereon was absolutely void, and must be set aside as such.

This settles the case, but, if I am to follow the rule laid down for the state courts, and decide all the points fairly arising upon the record, a brief consideration may properly be given to the third objection—that the separate assessment of the undivided interest in "oil, gas, and other mineral substances" was wholly unauthorized by law, and therefore void. No valid sale can be made for nonpayment of delinquent taxes where there has been no legal assessment of such taxes. Cunningham v. Brown, 39 W. Va. 588, 20 S. E. 615. Section 25 of chapter 29 of the Code of West Virginia of 1899 provides:

"Where a tract or lot of land becomes the property of different owners, in several parcels, or one person becomes the owner of the surface and another of the minerals under the same, or of the timber alone on said land, the assessor shall divide the value at which the whole had before been assessed, among the different owners, having regard to the value of each interest, compared with that of the whole and enter the same in the land book."

It is clear from an examination of the tax laws of Virginia and of this state from the Revised Code of 1819 (Va.) down to the present day that the system of taxation for farm and other lands, except town lots, has been based upon the "tract" as a whole as a particular identity. The "tract," the "parcel," the "homestead," the "farm," are words the most common known to the law in these states, and they all convey the same meaning involving a boundary of land identified and distinct as such. All these tax laws have required the separate and distinct tracts to be assessed. Section 8 of chapter 183, Rev. Code (Va.) 1819, directs that:

"The commissioners shall enter each tract of land separately in their said books; and according to the best information which they can obtain, shall particularly describe the same in the manner following: In the first column they shall enter the name of the person, who, by himself, or his tenant, has the freehold in possession; in the second, the place of his residence; in the third, his estate, that is, whether for life, or in fee; in the fourth, the number of acres of land; in the fifth, the description of the land as to the water courses, mountains, or other notorious places, on which or near to which it.

lies, other lands which it adjoins, and the number of the tract, if any; in the sixth, its distance and general bearing from the court house of the county."

These requisites for the identification of the "tract" of land as such have been continued from that day to this in our assessment laws, and are substantially found in section 37, c. 29, of the Code of 1899, and also in section 49 of chapter 35, p. 303, of the Acts of 1905. In all it is to be observed that the "tract" was to be assessed in the "name of the person who, by himself or his tenant, has the freehold in possession." The man in possession would have the use, the rents, issues, and profits, hence should pay the taxes, was and has been the reasonable theory. Section 25 of chapter 29, so far as it provides for separate assessment of surface and mineral held by different ownership, was a departure, first enacted February 29, 1860, and was incorporated into and made a part of section 22, c. 35, Code Va. 1860, from which it has come down to us with slight amendment regarding timber held separately. As I have said, the theory of our tax laws has all these years been to assess lands by "tract" identities to the person having the freehold in possession. I do not think there can be any doubt of the fact that this new section contemplated division of assessment of a tract only where there had been complete severance of the surface and minerals in ownership. This is made very plain by the words of the original act:

"In all cases in which the surface of land is held by one person, and the minerals under the surface are held by another, the commissioner or commissioners of the revenue in counties in which any such mineral and surface titles exist, are hereby authorized and required to determine the relative value of each," etc.

This makes clear that the severance was to be complete, and the holding to be by separate titles. It seems to me clear that no such severance could possibly be considered as having been made where there has been conveyed, as in this case, only a fractional undivided interest in the minerals. It being an undivided interest, the idea of severance is, on the contrary, refuted. It is an interest with the owner in and to every drop of oil, every inch of gas, and every atom of mineral substance. Therefore section 25 of chapter 29 does not apply. On the contrary, the general rule does apply that the person was to be taxed who had the freehold in possession; in this case Mrs. Kelley. It is therefore, without need of further discussion, sufficient to say that the undivided sixteenth interest could not be assessed to Barnes, that there was no warrant in law for such assessment; therefore for this reason the sale and deed made to Bee were absolutely null and void.

In conclusion I have some trouble in my mind in determining what direction should be made herein as to the payment of costs. The plaintiff, Barnes, has tendered and deposited with the clerk of this court $15 on account of the taxes paid and expenses on the part of defendant Bee in obtaining the tax deed. The Supreme Court of Appeals of West Virginia has determined that, where a tax deed is vacated for irregularities in the proceedings, the owner, as a condition precedent, must pay these taxes, interest, and expenses as

required by chapter 31, § 25, of Code 1899. Mosser v. Moore (W. Va.) 49 S. E. 537. On the other hand, it has held, where such deed is set aside as absolutely void under a sale unauthorized by law, the owner will not be required to repay the tax purchaser his outlay. State v. McEldowney (W. Va.) 47 S. E. 650. The latter condition is the case here, so that the clerk is directed to return to plaintiff, Barnes, the $15 deposit made by him. As to the costs of this suit itself, I very well understand the general rule that the prevailing party will recover, but my judgment has been for some time that in cases of this kind an exception ought to be made. In fact, I believe that possibly as strong an excuse or reason as could be urged for the enactment of the curative statute referred so frequently to herein was the fact that, owing to the persistent and almost universal neglect and violation of law of the officers charged with making tax records it became generally current that no sale would stand, and the purchaser would be sued, and have his deed set aside, and heavy costs to pay, whereby citizens were deterred from buying. The true remedy for this, in my judgment, would have been by statute to have required such officers to be made parties to the suit, and, in case the sale had to be set aside because of irregularity or violation of the law, assess both costs and damages against the one or ones responsible for the error or illegal acts. When a man buys in a tract of land offered him by the state at a tax sale, he has a right to presume that the state, in representing it to be properly assessed, returned delinquent, and subject to sale, is, through its agents, representing the truth; and, having bought, he has a right to stand by his sale until the courts say these representations were false. To amerce him in costs for the illegal acts and false representations of the state's agents does not seem to me to be right. On the other hand, the plaintiff owner may well be reminded to be diligent in looking after his taxes by letting him know that if he does not, and suit has to be brought by him, his rights will be preserved to him therein, but he must look only to the officers whose fault has caused him the trouble to indemnify him his costs, expenses, and damages. In this case the costs have been increased to the extent of $108 by the wholly unnecessary reference of the case to a special commissioner to ascertain facts that were fully disclosed by the exhibits filed with bill, and this sum, by consent of parties, has been paid out of money in the receiver's hands under order which reserves decision as to the party who should ultimately be required to pay. As I have said, this reference was unnecessary and unwarranted. It does not appear upon whose motion it was made, and I think, in the absence of such appearing, I must presume that it was made on motion of the plaintiff, whose duty it always is in prosecuting suit to see that no unnecessary or vexatious costs are incurred by him to be ultimately taxed in most cases where he prevails against his adversary. Therefore, if I had determined to award costs in this case against defendant, this item would have been directed to be omitted from the taxation thereof. Under all these circumstances let decree be entered setting aside the tax sale and deed as absolutely void; directing the

$15 deposit made by plaintiff with the clerk to be returned to him; further ascertaining the sum now in the hands of Receiver Dellicker arising from the sale of oil due this interest, and directing such sum, less the receiver's actual expenses incurred and a 5 per cent. commission for his services, to be paid over to plaintiff, or his attorney, providing that duplicate receipts be taken by the receiver for such payment, one of which shall be filed in the papers of the cause and the other retained by him; further directing said receiver to turn over said oil interest to said plaintiff free and acquit from any further control of his as to the same or over the proceeds arising therefrom, and setting forth that said receiver, by paying said fund and turning over said property, will acquit himself and sureties from all liability by reason of his receiver's bond; and finally directing this cause to be stricken from the docket of this court as ended, without costs awarded to either parties.