**BOARD OF EQUALIZATION OF CARTER COUNTY et al. v. CARTER OIL CO.**

No. 21698. Opinion Filed Oct. 6, 1931.

John L. Hodge, Co. Atty., and Stephen A. George, for plaintiffs in error.

James A. Veasey, L. G. Owen, Forrest M. Darrough, and Earl A. Brown, for defendant in error.

RILEY, J. This proceeding was instituted in the name of the state of Oklahoma for the purpose of subjecting certain omitted property of the Carter Oil Company to taxation on an ad valorem basis for the fiscal year 1926-27. The property involved was omitted by the company in its tax returns, but was added to the tax rolls by the county assessor. The company filed its objections with the board of equalization.

The property involved was:

One warehouse and its contents, consisting of material, equipment and supplies concentrated therein for the purpose of being used in and around the producing oil wells of the Carter Oil Company in Carter county, Okla.; twenty lease houses erected and maintained by the defendant for the sole purpose of housing its employees employed upon various producing leases in Carter county, Okla.; one ice plant manufacturing and furnishing ice free to the company's employees; one oil house for storing oil used in automobiles and machinery used in connection with the operation of the company's producing leases; one hospital maintained for furnishing medical aid and attention, and especially first aid to the company's employees who might be injured in the performance of their duties on producing leases.

On July 19, 1926, a hearing was had before the board of equalization of Carter county. On August 31, 1926, the said board overruled the objection of the Carter Oil Company to the assessment, and thereafter the company perfected an appeal to the district court. The taxes upon the assessment were paid under protest and suits instituted against the county treasurer of Carter county to recover therefor as each half of the taxes fell due. These two suits against the county treasurer were consolidated with the action on appeal from the board of equalization. The trial court rendered judgment on March 19, 1930, wherein it was recited:

"The court finds that the property above referred to and described in the cause of action aforesaid, to wit, warehouses, houses, warehouse equipment, material and all other property described in the seventh cause of action, is not subject to ad valorem taxation under the laws of the state of Oklahoma, by reason of the terms of the gross revenue law, said property being used or to be used in the production of oil and gas by the said Carter Oil Company."

Judgment was rendered in favor of the Carter Oil Company against the county treasurer of Carter county in the sum of $2,298.96, the amount of taxes paid under protest. This appeal is from that judgment.

Appellant states the issue involved under the single proposition: "The judgment of the court is contrary to law."

Appellee says:

"There is but one issue involved in this cause, and that is as follows: Is the property above described relieved of the burden of ad valorem taxation by reason of the provisions of the Gross Revenue Law as found in section 9814, C. O. S. for 1921?"

Section 9814, C. O. S. 1921, after providing for a statement to the State Auditor by every person, firm, association, and corporation engaged in mining or production of asphalt or ores bearing lead, zinc, jack, gold, silver, or copper, or of petroleum or other crude oil or other mineral oil or of natural gas, requires the payment of tax on such products based upon the gross value thereof, and states:

"The payment of the taxes herein imposed shall be in full and in lieu of all taxes by the state, counties, cities, towns, townships, school districts and other municipalities upon any property rights attached to or inherent in the right to said minerals, upon leases for the mining of asphalt and ores bearing lead, zinc, jack, gold, silver or copper or for petroleum or other crude oil or for natural gas upon the mining rights and privileges for the minerals aforesaid belonging or appertaining to the land, upon the machinery, appliances and equipment used in and around any well producing petroleum or other crude or mineral oil or natural gas, or any mine producing asphalt, or any of the mineral ores aforesaid and actually used in the operation of such well or mine; and also upon the oil, gas, asphalt or ores bearing minerals hereinbefore mentioned during the tax year in which same is produced, and upon any investment in any of the leases, rights, privileges, minerals or property hereinbefore in this paragraph mentioned or described; but any interest in the land other than that herein enumerated, and oil in storage, asphalt, and ores bearing the minerals hereinbefore named, mined, produced and on hand at the date as of which property is assessed for general and ad valorem taxation for any subsequent tax year shall be assessed and taxed as other property within the taxing

district in which such property is situated at the time."

Thereafter within the statute is a provision made for the adjustment by the State Board of Equalization of the rate of gross production tax by increasing or diminishing the same to conform to the rate for ad valorem taxation.

The meaning of the words "used" and "actually used," as contained in the statute quoted and emphasized by us, is the gravamen of this lawsuit.

Appellant contends that no such property as involved here is relieved from ad valorem taxation by reason of this statute unless the same is in present use in some operation employed to extract oil, gas, or other designated minerals from the earth. Whereas appellee contends that such property, to be exempt from ad valorem taxation, is either that used or to be used, thus extending the exemption to all property "which a producer might find necessary in its business of producing oil."

We consider, first, the item of the warehouse and its contents, consisting of material, equipment, and supplies concentrated therein for the purpose of being used in and around the producing oil wells of the Carter Oil Company. This property is not in actual use, but is stored in a central location for convenience and intended for future use in the operation of leases belonging to the company and for the production of oil. This item is not exempt from ad valorem taxation. We arrive at that conclusion by the plain meaning of the statute, supra, under the terms of which the exemption is claimed (Consolidated Sch. Dist. No. 72, Carter County, v. Board of Education of City of Wilson, 113 Okla. 217, 242 P. 173), and without the aid of the rule of strict construction, applicable when a special privilege or exemption from the taxing power is claimed. Cooley on Taxation (4th Ed.) vol. 2, p. 1403. However, we note a paragraph contained in the last-mentioned work at p. 1441, which reads:

"An intention to use property at some uncertain time in the future, for the purposes which will render it exempt from taxation under the law of the state, does not preclude its taxation before actually used for the purposes warranting an exemption. If the use determines the right to exemption, it is the present use and not the intended use in the future which governs."

Likewise it is to be noted that the Legislature was not content with merely stating the exemption from ad valorem taxes for all property used in and around such a well or mine, but reiterated the subject-matter and emphasized the words "actually used" as a condition precedent for the substituted gross production tax.

Supporting our conclusion is the case of Board of Co. Com'rs v. Alexander, 58 Okla. 128, 159 P. 311, wherein this court in construing this statute held that Creek county is prevented from levying and collecting an ad valorem tax on "not only the oil and gas produced, but the equipment and machinery in and around any well producing natural gas or petroleum or other mineral oil, **and used in the actual operation of such producing well.**" Thus showing a construction of the statute limiting, by necessary inference, the exemption of such property from ad valorem taxation to that used in the actual operation of such producing oil well.

The decision in Re Gross Production Tax of Wolverine Oil Co., 53 Okla. 24, 154 P. 362, squarely determines the issue involved in the first item herein concerning the warehouse materials, machinery, appliances, and equipment stored for future use. Therein this court, in determining the property exempted from the ad valorem tax by reason of payment of the gross production tax, held:

"The equipment and machinery referred to is confined to that used in the actual operation of producing wells, hence, does not include equipment and machinery on hand, and not so used."

In Skelton Lead & Zinc Co. v. Harr, 104 Okla. 137, 230 P. 691, where ad valorem tax on equipment of a lead and zinc mine was protested on the ground, among others, that it was not subject to such ad valorem tax because of its use in the production of minerals taxable under gross production levy, but where it was established that the equipment had not been used in production of such minerals for the years for which the ad valorem tax was levied, although it had previously been so used, it was held:

"* * * This mill was subject to the ad valorem tax under the general tax provisions of the state."

In that case other mines of the company were in use and no doubt the equipment of this particular mine was intended for future use; nevertheless, since it was not actually used in such mineral production, it was held to be subject to ad valorem taxes.

The case of Going, Co. Treas., v. Shaffer, 89 Okla. 46, 213 P. 736, presented the question whether storage tanks some six to ten miles distant from the producing well in

which oil was pumped as produced and from which the oil was marketed, were relieved from ad valorem taxes by reason of the payment of gross production tax on the oil. This court held:

"That the steel storage tanks and pipe lines connecting them with the receiving tanks were not exempt from the payment of the ad valorem tax under the provisions of section 9814, C. O. S. 1921."

And that:

"In order for property or equipment to be exempt from the payment of other tax under the provisions of section 9814, Comp. St. 1921, such property must be an indispensable agency in the discovery and production of the petroleum, and must be used in and around a producing well, and be actually used in the operation of such well."

Appellee relies upon the case of Wm. M. Graham Oil & G. Co. v. Oil Well Supply Co., 128 Okla. 201, 264 P. 591, but it is not applicable, for it construes section 7464, providing a lien for labor or material upon an oil and gas lease and appliances used in the operation for oil. There it was held the term "furnish," as used in section 7464, C. O. S. 1921, means to supply a thing for use in the accomplishment of a particular purpose; and the term "used" means the employment of a thing for the accomplishment of a particular purpose. That case did not turn upon the statute now under consideration, nor did it consider such a statute wherein there were used the words "actually used."

Josey Oil Co. v. Co. Com'rs of Payne County, 107 Okla. 266, 231 P. 272, relied upon by appellee, originated in an effort on the part of the taxing authorities to subject machinery and equipment employed in the operation of a producing oil lease as well as lease houses to ad valorem taxes. The trial court held the machinery and equipment not to be subject to ad valorem taxation, but held that the lease houses were so subject to taxation in that form. Thereafter the trial court vacated its judgment for the reason it was shown that the taxes had not been paid under protest. The oil company appealed and presented only the questions whether the court erred in vacating the judgment and "whether the trial court erred in holding taxable the employee's houses on plaintiff's oil lease."

This court held that the gross production tax was in lieu of any other taxes that might be levied and collected upon an ad valorem basis upon the equipment and machinery "in and around any wells producing natural gas or petroleum or other mineral oil and used in actual operation of such producing well from which a gross production tax is collected."

Thus stating the uniform rule announced in the cases heretofore cited, the court further held:

"It is clear that all of the property attempted to be taxed as set out here, except the houses, consisted of equipment and machinery used, or to be used, in the production of oil upon the leases of the Josey Oil Company."

Thus affording a contention to appellee that the rule for denial of ad valorem tax upon such machinery is based not upon that actually used, but upon that to be used. Such is not the rule, nor does the Josey Case so hold, for it will be observed that this court there complained that there was no cross-appeal by defendant in error and held that the scope of the decision was limited to the vacation of judgment and to the question of ad valorem tax upon the lease houses.

In other words, while it was clear in the Josey Case that the equipment exempted from ad valorem tax by the trial court was that used or to be used, and notwithstanding the uniformity of decisions holding that the exemption applied only to such equipment actually used as an indispensable agency, in and around such a producing well, so that such part of the equipment as was not in use, but kept for future use, would be subject to ad valorem taxation, nevertheless, in view of the fact that no cross-appeal was perfected, only the matter of taxation on the lease houses would be considered.

However, it was held in the Josey Case that:

"The question whether certain houses built by the operator of an oil lease for housing his employees are a necessary part of the equipment of a producing oil lease is one of fact to be determined by the court under the circumstances of each particular case."

And we adhere to that rule, for in some situations such houses might be dispensable agencies of a producing well or mine; for example, in the Oklahoma City oil field, where such conveniences are afforded in close proximity to the wells; but we can imagine a situation where an oil well or mine might be located in inaccessable country, and unless lease houses be provided for employees, and in event they were required to live in distant settlements and required to travel undeveloped roads or trails,

the production of minerals would be seriously impaired.

What we have said as to the lease houses also applies to the items for the ice plant, for in certain locations ice is as indispensable as shelter. Likewise, the same conclusion applies to the item for hospital or first aid station.

The judgment as to these items and all except the first, i. e., warehouse and contents stored therein for future use, is sustainable and is sustained.

The judgment upon the first item is reversed, with directions to enter judgment thereon in favor of appellant.

HEFNER, CULLISON, SWINDALL, ANDREWS, and McNEILL, JJ., concur.

LESTER, C. J., CLARK, V. C. J., and KORNEGAY, J., dissent.

---

KORNEGAY, J. (dissenting). This is a tax case coming from Carter county, the Honorable Asa E. Walden being the judge. The decision of this court, in part, as now rendered, reverses the action of the lower court in exempting from taxation the property of the Carter Oil Company, but sustains it in part on grounds untenable, as the matter appears to me. The premises of the opinion in this case appear to be sound. The deductions, however, are not dependable.

A statement of the case, from the brief of the Carter Oil Company, is as follows:

"We believe a brief restatement. of the facts in this case will serve to clarify the issue involved. On the 19th day of July, 1926, the county assessor of Carter county, Okla., made an arbitrary assessment of certain materials and property of the Carter Oil Company located in school district No. 73 of Carter county, Okla., consisting of the following:

" 'One, warehouse and, its contents, . consisting of material, equipment, and supplies concentrated therein for the purpose of being used in and around the producing oil wells of the Carter Oil Company in Carter county, Okla.; twenty lease houses erected and maintained by the defendant for the sole purpose of housing its employees employed upon various producing leases in Carter county, Okla.; one ice plant manufacturing and furnishing ice free to the company's employees; one oil house for storing oil used in automobiles and machinery used in connection with the operation of the company's producing oil leases'; one hospital maintained for furnishing medical aid and attention, and especially first aid to the company's employees who might be injured in the performance of their duties on producing leases.'

' On said July 19, 1926, a hearing was had before the board of equalization of Carter county as to whether or not the complaint and objections of the Carter Oil Company to said arbitrary assessment should prevail, and on the 31st day of August, 1926, an order was made by the board of equalization of Carter county, Okla., overruling the complaints and objections of the Carter Oil Company, which was duly excepted to by the Carter Oil Company, and an appeal perfected to the district court of Carter county, Okla.

"Thereafter, the taxes assessed under the said arbitrary assessment became due and were paid by the Carter Oil Company under protest, and suits were brought by the said company against J. S. McCharen, county treasurer, to recover the taxes paid under protest. These cases are each styled the Carter Oil Company, a Corporation, v. J. S. McCharen, County Treasurer of Carter county, Oklahoma, and are numbered 15259 and 15428 in the district court of Carter county, the former being for the recovery of the first half of the taxes paid under protest, and the latter for the second half of such taxes, as paid under protest. .

"On the 9th day of April, 1928, the said two cases were consolidated with No. 14620 in said court, same being the Appeal of the Carter Oil Company from the Board of Equalization of Carter County, Oklahoma, and the consolidated case came on for trial. The trial court, at the conclusion of the hearing, took the case under advisement for the purpose of reading the transcript of the evidence, and ordered counsel on both sides to submit briefs. Briefs were submitted, and thereafter, on the 19th day of March, 1930, the court rendered a judgment in which the following finding was made in the journal entry of judgment:

" 'The court further finds that the property above referred to and described in the seventh cause of action aforesaid, to wit, warehouse, houses, warehouse equipment, material, and all other property described in the seventh cause of action, is not subject to ad valorem taxation under the laws of the state of Oklahoma, by reason of the terms of the gross revenue law, said property being used or to be used in the production of oil and gas by the said the Carter Oil Company.' (C.-M., p. 193.)

"Judgment was rendered in favor of the Carter Oil Company against the county treasurer of Carter county in the sum of $2,298.96, same being the amount of taxes paid under protest.

"From an order overruling a motion for a new trial in the consolidated cause, the plaintiff in error is prosecuting this appeal."

The portions of the statute specially ap-

plicable to the solution of the questions involved are found in section 9814, C. O. S. 1921, and are as follows:

"The payment of the taxes herein imposed shall be in full and in lieu of all taxes by the state, counties, cities, towns, townships, school districts and other municipalities upon any property rights attached to or inherent in the right to said minerals, upon leases for the mining of asphalt and ores bearing lead, zinc, jack, gold, silver or copper or for petroleum or other crude oil or other mineral oil or for natural gas upon the mining rights and privileges for the minerals aforesaid belonging or appertaining to land, upon the machinery, appliances, and equipment used in and around any well producing petroleum or other crude or mineral oil or natural gas, or any mine producing asphalt, or any of the mineral ores aforesaid and actually used in the operation of such well or mine; and also upon the oil, gas, asphalt or ores bearing minerals hereinbefore mentioned during the tax year in which the same is produced, and upon any investment in any of the leases, rights, privileges, minerals or property hereinbefore in this paragraph mentioned or described; but any interest in the land other than that herein enumerated, and oil in storage, asphalt, and ores bearing the minerals hereinbefore named, mined, produced and on hand at the date as of which property is assessed for general and ad valorem taxation for any subsequent tax year shall be assessed and taxed as other property within the taxing district in which such property is situated at the time.

"The State Board of Equalization, upon its own initiative, may, and upon complaint of any person who claims that he is taxed too great a rate hereunder, shall take testimony to determine whether the taxes herein imposed are greater, or less than the general ad valorem tax for all purposes would be on the property of such producer subject to taxation in the district or districts where the same is situated, including the value of oil, gas or mineral leases, or of the mining or mineral rights, the machinery, equipment or appliances used in the actual operation of, in and around any such well or mine, the value of the oil, gas, asphalt, or any of the said mineral ores produced and any other element of taxable value in lieu of which the tax herein is levied. The said board shall have power and it shall be its duty to raise or lower the rates herein imposed to conform thereto. An appeal may be had from the decision of the state board of equalization thereon, by any person aggrieved, to the Supreme Court, in like manner, and with like effect as provided by law in other appeals from said board to said court; provided, that after such tax has been collected and distributed, or paid without protest, no complaint with reference to rate thereof shall be heard or considered."

The record in this case shows that the property involved was placed upon the assessment roll by the authorities of Carter county at a very limited valuation; houses in this case, worth probably $800 and modern, being assessed at only $100 at one time, but being raised by the assessor to $200. Evidently this $100 assessment had been used in previous years. (C.-M. p. 118.)

The matter before us originated in two places, one, before the board of equalization, wherein the Carter Oil Company sought to have stricken certain property. The other was in the district court, the Carter Oil Company seeking to recover taxes alleged to have been unlawfully exacted and paid. There were two of the suits, one was for the first half of the taxes, and the other for the latter half. Each suit was for $11,110.21, alleged to have been paid wrongfully, totalling $22,220.42, including $2,298.96 here in controversy. In the meantime, an appeal had been taken from the equalization board to the district court, the order of the board being that the property should remain on the assessment list as assessed, but the valuation, fixed by the assessor on the booster station was reduced from $68,000 to $20,000. All these matters were consolidated, and came on for trial before the district court at Ardmore on the 9th of April, 1928.

In the proceedings before the equalization board, the Carter Oil Company was represented by attorneys, as shown by case-made, beginning on page 65, in which they objected to there being left on the tax roll the property mentioned in their statement here. Four attorneys, namely, Messrs. H. A. Ledbetter, J. A. Veasey, L. G. Owen, and Walter Davison, appeared on behalf of the company. Complaint was made as to a "booster station" that the company had put in at $8,000, being listed at $68,000. The board of equalization cut this valuation to $20,000, and allowed the other valuations to stand. There seems to have been no complaint as to the other valuations, except a manifestation by the attorneys of objection to the increase of the houses over a former assessment. (C.-M. pp. 116-120.)

The examination was conducted by Mr. Ledbetter before the board, and by Mr. George, on behalf of school district No. 73. The county attorney, Mr. Dudley, remained, so that he could be classed as conducting the case, but the real burden of the examination was borne by Mr. George. Mr. Ledbetter suggested that the county attorney's position was that of hearing the testimony and reading the authorities, and advising the

equalization board as to points of law for their guidance, as found on page 75 of the case-made. At page 76, objections were made to the school district No. 73 being represented by Mr. George, because the county attorney was the legal adviser of the county, and each of its subordinate parts, including school district No. 73, and for the further reason that the Carter Oil Company felt that it was not Carter county, or the tax assessor of Carter county, that was making the fight, but school district No. 73.

Mr. Leslie M. Hammers was called on behalf of the Carter Oil Company, and stated that the purpose of the houses, maintained in school district No. 73, was to take care of the men who worked on this lease in the different departments. Most of the houses were made in Tulsa, were collapsible, and were movable, some three, some four, and some five rooms, and were occupied by pumpers and foremen. He described the ice plant as having capacity to make 1,000 pounds of ice a day, and to provide the leases with ice. He thought it was necessary for the convenience and comfort of the employees. That Wilson would be the nearest point for them to get ice, and the hospital was for the benefit of the employees, and they were directly engaged in the production of oil in that district. The garage was there to house the cars and would accommodate 25. He thought it was necessary to furnish the farm foreman a car. It developed that they had several large trucks, and several Ford trucks and trailers, and finally Mr. George objected to the manner in which the witness was being led. The warehouse was described, and an oil house, and it developed that there was a large amount of material in it that they were going to use at sometime. Mr. Ledbetter insisted that the board had already passed on the question, during the argument, as to what the material was used for. He stated that all the other companies concentrated their materials in the district, and Mr. George objected and Mr. Dudley was asked by the court what he thought about it, and Mr. Ledbetter interrupted, and finally the county attorney said that either way that they ruled would be agreeable to him, and at page 91 Mr. George retorted:

"While they make their record, we want to make ours."

And the court retorted:

"I think we object to showing what other companies do. The objection is sustained."

Several questions were asked Mr. Hammers about the purposes of the warehouse being to protect the supplies and being used as a distribution center. On cross-examination, he detailed that he thought they had 15 or 20 leases in Hewitt field in and around school district No. 73. It developed that Wilson was two miles away, a modern city with modern conveniences, including lights, sewer, gas, water, and there were two other towns on the leases, Dillard and Rexrote, with some dwelling houses in each. That some of the houses had been torn down in the latter places. That no reduction was made in salary on account of furnishing the houses. The ice plant had probably a capacity of one and one-half tons, and it would be inconvenient not to have ice. That they took out ice to the various leases during the summer months. Did not know whether he could get plenty of men without furnishing houses and ice or not. There was an ice plant at Wilson capable of supplying all the demands, and that they had three or four tank farms in district No. 73. The hospital was a 5-room house, and the Carter Oil Company carried its own insurance under the Workmen's Compensation Law. There was a hospital at Wilson. He figured that it was essential to have a hospital. Some examination was made as to the garage having capacity to take care of 25 cars. The cars were not used in pumping oil. That they did not take vacations in them any more, but that such had been known. There was an oil house there, used for storing oil for greasing purposes. He testified that they carried supplies and machinery on hand in the warehouse for a year or more, and some had not been used for years. It was put in there and intended for future use. There was some colloquy between the attorneys about Mr. Ledbetter testifying on page 101, and Mr. Hammers was cross-examined. It developed that the hospital was more of a first-aid station than anything else. That the central warehouse of the Carter Oil Company was maintained in Tulsa, and that the warehouse in question was a branch warehouse. The drilling tools were used for cleaning-out purposes.

It developed that the Oklahoma Pipeline Company had a pump on the lease, and that the gravity system was used, and aside from one pumper, the Oklahoma Pipeline Company provided everything else. The examination was resumed by Mr. Ledbetter, at page 110, and it was brought out that they had some stuff that was unnecessary to be used by the Carter Oil Company, and if they did not have the stuff on hand, they would telephone to Tulsa. At page 112, witness gave his experience, and drew the conclusion that, as an oil man for several

years, he felt it indispensable to the production of oil that one should have houses to house the workmen, and that some of the large companies did the same way, and the same way with drilling outfits. He stated that what equipment they had was for the purpose of producing oil.

On cross-examination he stated that appliances, equipment, and machinery in the warehouse, were not actually in use when they were there, and it ran into thousands of dollars, and that the machinery in the warehouse was not associated with any particular lease. That a lot of the workmen, working on the lease, lived in Wilson, some in their own houses, some in rented houses in Rexrote and Dillard, and did not think he could get as good employees without furnishing houses. That their houses had modern conveniences, and that their employees did better work. The houses were modern, had bath and hot water and cold running water, and must have cost about $800. At page 117, there was a colloquy about grocery stores, and the court did not think it was necessary to find out about this. At page 117, there was considerable colloquy between the parties about raising the valuation on the houses. The court, the excise board, thought it was its duty to stand by what the assessor had done. It is stated that the assessor was directed by the board to make the valuation. Mr. Ledbetter wanted "the record kept straight." Mr. Davison admitted "that the houses were $100 each," and the testimony of Mr. Hammers was closed.

Mr. Bryan B. Pyle was introduced, and he stated that he was the warehouse foreman. That all the material was kept in a warehouse for the producing of oil in general, it being mostly pumping material, cleaning-out tools, and automobile parts. This was the main concentrating point of the Carter Oil Company. Its sole purpose was the production of oil.

Mr. Kirkpatrick was examined. He had charge of all the producing properties in Carter county, under Mr. Hammers. Their houses were used for employees, and he thought it was essential to the business of the Carter Oil Company that they have them. It was better to have them close. His idea was that they had the warehouse to have the equipment for the producing properties. It would be a great deal of expense to have a warehouse on each lease, and it was devoted strictly to the production of oil. That the Oklahoma Pipeline Company used their storage for the last 18 months. That the hospital was a first-aid

station. The ice plant had one and one-half tons capacity. That they had a double wall house to put the ice in. That it was taken out by each foreman, and used free of charge by each of the men. That it was very convenient to have it there. That they had an automobile house for their trucks and for their foreman's cars. Some of the men employed drive 30 miles to and from work, living in Ardmore and Ringling, and some in Wilson. That his company was a very good company, and have no trouble. That they do not have to pay rent when they get the house. They did not furnish houses for roustabouts at all. At page 136, after some colloquy, he says the ice is not necessary, but very essential.

The tax auditor of the company, Mr. Wells, was put on the stand. It developed that in the year 1925 the company paid $176,837.38 ad valorem taxes. Gross production tax in 1925 and for the first quarter of that year was $68,624.27. Interrogation was made about the booster station, and it was not completed at return time in 1923, and was listed in 1924, '25, and '26 at $8,000, and the tax authorities did not raise the valuation. At page 141, there is a colloquy as to who made the request to raise. He thought $8,000 was a fair and just valuation. If all the property in Carter county was on the basis that this was, there would be a splendid increase in valuation. The original cost was $59,819.98. It was carried at that on the company's books. There was some colloquy on page 147 about being surprised at the raise on the booster, but it developed that the assessor had gone on the ground and made it.

Mr. L. H. Woods was introduced on page 149 on behalf of the school district, and it developed that recently he had gone, in connection with Mr. Ralph E. Vann, deputy tax assessor, over the Carter Oil Company's property, with a view of getting it on the tax roll. That he went with the party to locate it. He described the booster station with 7 engines, six 80 horse-power, and one 165 horse-power, as stated by the engineer. The court rules this out, as being not permissible. He also stated, from what he knew himself, that the figures were correct. As to the value of the machinery, he only knew from what various oil field workers, knowing the value, told him. This was the end of the testimony, and the equalization board allowed the warehouse stock and building to stand at $50,000, ice plant at $750, the oil house at $200, hospital at $500, 20 residences at $4,000, and the booster station

at $20,000. Notice was given to the parties, followed by the appeal and the consolidation of the cases, as heretofore stated. According to the statement in the petition at page 8, the assessed valuation of the company's property in Carter county was $5,-879,385. The first half of its ad valorem tax was $101,844.60. Practically three and one-half per cent. was the tax rate.

The case reached the district court before Judge Walden, who, without making any formal findings of fact, as shown on page 188, announced that he and Judge Ogden thought the property in the case shows, "to have been used by the Carter Oil Company in the production of crude petroleum on its leases in Carter county, and that this camp house and houses are all a necessary part of the oil company's property in the production of oil, and, therefore, the gross production tax is necessarily all based in the Carter Oil Company, and Carter county is not allowed to place that property upon the ad valorem tax rolls of this county, and the judgment therefore be for the Carter Oil Company." After some colloquy, it was announced by Judge Walden, at page 189, as follows:

"No, the Carter might put their freight house in the city, yet, the Carter Oil Company operates all over the state; doesn't make any difference where they are situated —at least, that is our opinion at this time, and we are holding."

The judgment, found on page 191, finds that the property that was assessed under protest was not subject to tax, and the amount paid was ordered returned by the treasurer to the Carter Oil Company. The remaining matters and things complained of appear to have been disposed of satisfactorily to the Carter Oil Company, and are only incidentally involved here. The record of that branch of it is found at page 44, and those matters came on for trial on the 9th of April, 1928, and were disposed of largely by stipulation. It was stipulated that $349.24 should be recovered back on the first count. At page 59, there is a stipulation about the ice until there is a surplus, and then the surplus is sold to the other employees of the Carter Oil Company, who do not come within the classification of those who are entitled to free ice. The journal entry, found on page 178, shows a recovery of $14,-327.56. This was in addition to the second judgment for return of the taxes paid that are here directly involved.

The amount involved in this case, from the standpoint of the plaintiff, is relatively small. From the standpoint of a great many taxpayers, it is almost princely. This proceeding happened before our tax laws were amended by initiative measures. The procedure, in force when this controversy arose, allowed the large taxpayer, who is able to employ skillful lawyers, to recover the amount of taxes illegally exacted, while the great mass of small taxpayers would have to leave, in the hands of the taxing authorities to be used in defraying expenses of government, any illegal taxes paid, as the expense of the litigations would exceed the amount of recovery. In some respects, this was changed by the initiated measure, State Question No. 152, that was later adopted at the polls. By this measure, one of the impediments to equality of taxation was removed by providing that everybody should get a rebate, just like the large taxpayer who was able to litigate, in the event the exaction was found to be illegal.

According to the record here, the amount recovered by the company, on account of ad valorem tax paid on property admitted to be subject to tax, was $14,327.56, on property claimed as exempt, $2,298.96, approximately more than 8 per cent. What about the average citizen who is unable to hire lawyers for protection? Is there any foundation in fact for the expression "God tempers the wind to the shorn lamb?" The efforts of the Carter Oil Company to stop the Saturnalia that appears to have been indulged in by so many "authorities" in this state are heartening, hope-inspiring, and highly commendable.

Coming to the opinion filed in this particular case, it appears that the warehouse material that the lower court freed from taxation, and the warehouse, are held to be subject to tax. The other items are held not to be. There is scarcely a disputed question of fact in this case, it depending on the view that is taken of the statute on the subject as controlled by the Constitution. Some opinions of some employees are set forth in the record, showing their ideas of what is good for the "production of oil." One is reminded, in reviewing this opinion, of the parable of the sower who went forth to sow. Some of the seeds fell on stony ground, some by the wayside, some among thorns, and some on good ground. The holding as to the warehouse and machinery evidently follows principle and precedent; the other holdings do not.

The history of taxation of the "liquid gold" industry in this state, indicates a struggle on the one side to shift the burden

to ad valorem taxation, and, on the other side, an effort to get something out of the oil business in the way of taxes, that would be commensurate with the police protection that is required and furnished. Very early in the history of this struggle, the case arose with reference to taxing a blanket lease in the Osage Nation. It reached this court, and this court rendered two opinions on it that the Supreme Court of the United States, in passing upon the matter later, was not able to reconcile. The opinion in that case was delivered by Mr. Justice McKenna, and is reported in 60 L. Ed. 779. It annulled the tax, holding that the lease was a federal agency, and therefore could not be taxed, using as a foundation for its opinion a former opinion in Choctaw, O. & G. R. R. Co. v. Harrison, 235 U. S. 292, 59 L. Ed. 234.

The personnel of the Oklahoma court changed between the original opinion and the second opinion. The second opinion can be found in 43 Okla. 307, 142 P. 997. In the first opinion the lease was held to be taxable, under the various provisions of the Constitution and statute law, and it was held to be assessable to the leaseholder. In the second opinion, it was held to be nontaxable, though there had been no change in the Constitution or the statutory law, and at page 318 of 43 Okla., we find the following conclusion:

"We, therefore, conclude that oil and gas, while lying in the strata of Mother Earth, from which they are produced, constitute a sort of subterranean faera naturea which, if taxed at all prior to being reduced to possession, must be taxed as real property to the owner of the land under which for the time being they may lie, and cannot be taxed against one who has a mere lease or license to go upon the premises, search for, and, if found, take them away. Frank Oil Co. v. Belleview Gas & Oil Co., 29 Okla. 719, 119 P. 260, 43 L. R. A. (N. S.) 487; Kclachny v. Galbreath, 26 Okla. 772, 110 P. 902, 38 L. R. A. (N. S.) 451; Carter v. Tyler County, 45 W. Va. 806, 32 S. E. 216, 43 L. R. A. 725; Kansas Natural Gas Co. v. Bd. of Com'rs of Neosho Co., 75 Kan. 335, 89 P. 750; Peterson v. Hall, 57 Va. 535, 50 S. E. 603; Barnes v. Bee (C. C.) 138 Fed. 476; Hughes v. Vail, 57 Vt. 41; State v. South Penn Oil Co., 42 W. Va. 80, 24 S. E. 688.

"It seems to us that this is the most scientific method for imposing taxation upon this class of property. To undertake to tax an oil or gas lease is to undertake to impose a tax upon the illimitable vista of hope."

The Supreme Court of the United States, in referring to this change, says (240 U. S 522, 36 S. Ct. 453, 60 L. Ed. 779):

"On rehearing, the court modified or changed its view. The changes and the reasons for them, are not easy to represent."

It then proceeded to review the case upon a point that both courts had held was not well taken, namely, that this was a federal agency. This opinion was delivered on April 3, 1916, the last opinion of the Oklahoma court being delivered on the 9th of June, 1914, and rehearing denied September 8, 1914. The statute that we now have, and under which the decision in this case is rendered, was of a later date. Its history, as given under section 9814, C. O. S. 1921, appears to be that it was a statute of 1916, amending the statute of 1915, and art. 2, sec. 1, Revised Laws 1910, section 7464. No sooner than it had started, every plan that ingenious lawyers could devise to save the oil companies from embarrassment under it, by reason of taxation, appears to have been resorted to. The original case in the Supreme Court of the United States, Choctaw, O. & G. Co. v. Harrison, cited by the Supreme Court of the United States in the opinion above, decided that it was an occupation tax, as distinguished from a property tax. With that as a slogan, it reviewed other cases subsequently coming from Oklahoma, and reached the conclusion that net income, derived from oil and gas leases on restricted lands, cannot be taxed, reversing the Oklahoma State Supreme Court. See case of Gillespie v. State of Oklahoma, 66 L. Ed. 338.

This idea was carried further in the case of Jaybird Mining Co. v. Weir, 70 L. Ed. 1112, resulting in the broad doctrine that without congressional consent, no federal agency or instrumentality could be taxed by state authorities. That was a tax on ore held by the lessee. Mr. Justice McReynolds and Mr. Justice Brandeis dissented, and the latter filed a vigorous dissenting opinion, one well reasoned and backed by authorities that are convincing, from the Supreme Court itself. In that opinion, Justice Brandeis says:

"I suspect that my brethren would agree with me in sustaining this tax on ore in the bins, but for Gillespie v. Oklahoma, 257 U. S. 501, 66 L. Ed. 338, 42 Sup. Ct. Rep. 171. The question there involved was different. Any language in the opinion which may seem apposite to the case at bar, should be disregarded as inconsistent with the earlier decisions. It is a peculiar virtue of our system of law that the process of inclusion and exclusion so often employed in developing a rule, is not allowed to end with its enunciation, and that an expression in an opinion yields later to the impact of facts unforeseen. The attitude of the court in this

respect has been especially helpful when called upon to adjust the respective powers of the states and the nation in the field of taxation."

There have been some cases decided by our own Supreme Court that appear to be applicable to the matter here in hand. In the case of Wenner v. Mothersaid, 129 Okla. 373, 264 P. 816, in holding that guaranty funds are subject to taxation, the court enumerates some of the principles and constitutional provisions applicable to matters involved in this case. Quoting from page 275 (129 Okla.):

"Besides section 50, art. 5, of the Constitution provides:

" 'Sec. 50. The Legislature shall pass no law exempting any property within this state from taxation, except as otherwise provided in this Constitution.'

"And section 46, subdivision (u) of article 5, Id., provides:

" 'The Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law.'

" (u) 'Exempting property from taxation.'

"The rule governing the claim of exemption from taxation is emphatically and clearly stated in Tulane Educational Funds v. Board of Assessors, 35 La. Ann. 668, as follows:

" 'Exemptions from taxation are always strictly construed against the exemption. Nothing can be supplied by intendment or inference.'

"The rule is stated by this court in Oklahoma City v. Shields, 22 Okla. 265, 100 P. 559, as follows:

" 'Claims of exemption * * * must be * * * by express grant.'

"See, also, 37 Cyc. 891; 26 R. C. L. pp. 313.

"The property in question not being mentioned in said section 6, art. 10, of the Constitution, and under said section 46 (u), art. 5, of the Constitution, and section 50, Id., the Legislature being without power to exempt property except as provided in the Constitution, and the recognized rule being that property is never exempted except by specific, definite provisions of law, it follows that the property involved herein is not exempt, but is subject to taxation, and that the honorable trial court erred in granting the order of injunction herein appealed from."

Under one branch of this case, that is to say the exemptions claimed for the landlord, under this law, this court has spoken in Kenoyer v. Board of Equalization of Ot-

tawa County, 130 Okla. 3, 264 P. 891. Syllabus 1 to that case, is as follows:

"1. The present gross production tax law on minerals (Comp. Stat. 1921, sec. 9814), does not operate to render real estate nontaxable on an ad valorem basis because the surface of the land is occupied by mining operations in the course of the development of the minerals beneath the surface."

This appears to be supported by the opinion.

So far has the fight gone to prevent the state from getting revenue to pay the expense of its municipalities and to enable them to do the things requiring money to be taken from the taxpayers, that it has been claimed that the proceeds from land that was subject to tax to start with, and purchased with restricted funds, could not be subjected to state taxation, and in Shaw, State Auditor, v. Gibson-Zahniser Oil Corp., 72 L. Ed. 709, decided by the Supreme Court of the United States, that court held that, notwithstanding the Secretary of the Interior had bought the land with restricted funds, the doctrine of federal agency preventing the payment of tax would not be extended to that case. It was concluded in that case that, in a broad sense, it was an instrumentality of the federal government, and the court proceeded to answer in the negative some questions propounded from the Circuit Court of Appeals to that effect. The lower court appears to have held the other way, and the Circuit Court of Appeals was in doubt, probably owing to the force that had been given to the claim that a federal instrumentality would interfere with the state's power of taxation. However, the Central Coal & Coke Company, in Craig county, evidently imbued by some chance expression from the Indian Territory Illuminating Oil Company Case, that really owned coal, thought it would be exempted, and it brought an action in the lower federal court to stop the assessment. The style of the case is Central Coal & Coke Co. et al. v. Carseloway, Co. Assessor, et al., and as decided by the Circuit Court of Appeals is reported in 45 Fed. (2nd) 745. In that case the court reviews our taxing law and the sections bearing on it, and by way of answer to the claim that our statutes would not permit the taxing of this coal, after reciting the history of the case, says:

"It is clear that the plaintiffs own properties of large value, situate in Oklahoma. Their ownership is secure because Oklahoma maintains a stable government. If plaintiffs need not contribute to the maintenance of that government, while enjoying

the benefits thereof, some all-sufficient reason should appear."

The opinion then proceeds to cite authority on the subject of the segregation of various interests, and our statute law on the subject, and by way of answer to the contention says:

"Plaintiffs meet this apparently impregnable legislative mandate by reference to the case of In re, Indian Territory Illuminating Oil Co., 43 Okla. 307, 142 P. 997, 1001, which, as far as we can discern, has no bearing on the claim asserted."

And further along says:

"Plaintiffs rely principally upon two sentences in the opinion, in one of which the court arguendo, stated that the Legislature had not provided for a severance of the various interests in real property for taxation purposes; and in the other stated that oil and gas must be taxed to the owner of the land. But language in opinions, like language in contracts and statutes, must be read with its context."

The conclusion of the opinion is as follows (p. 746 of 45 Fed. (2nd.):

"The plaintiffs own the coal in question; it cannot be taxed to the owner of the surface, because he does not own it, any more than the plaintiffs can be taxed for the surface which they do not own. Either this valuable property must be taxed to plaintiffs or not be taxed at all. And, if the mineral estate is exempt from tax because the taxing statutes are silent as to severed estates, why not the surface? No reason appears why one interest, the surface, should be taxed, and the other, the coal, should escape. The truth is that, if the contention of plaintiffs is sound, all interests in real estate, the surface, the minerals, the improvements, are automatically exempt from any taxation the moment a severance of the interests therein occurs, either by grant or reservation, for there is no more statutory authority for taxing the surface estate, after severance, than there is the mineral estate, after severance. We cannot read either the Oklahoma statutes or decisions to mean that real estate can be exempted from any taxation by the simple expedient of a severance of the estates therein. The decision of the trial court was right and is affirmed."

With these preliminary citations, an examination of the statute is convincing, that the Legislature never intended in this case to exempt the property involved herein from ad valorem taxation. If so, it was a very clumsy way to do so, under this statute. It is true that the Legislature, at different times, was somewhat handicapped in an attempt to tread the narrow path that had been left by the Indian Territory Illuminat-

ing Oil Company Case. It is further clear that the Legislature was bound by the Constitution, which provides for equality of taxation, as far as possible, as I view it. The sections are quoted above in one of the citations from this court.

It seems to me that the people, when they adopted the Constitution, meant something, and that whether we will or not, it is ever present in the consideration of judicial matters. On the subject of revenue and taxation, we find that section 50 of art. 5 provides that the Legislature shall not exempt any property from taxation, unless it can find a provision in the Constitution to that effect. And, again, in enumerating the powers of the Legislature, there shall be no such law exempting property from taxation, and, again, in law, the rule governing the claim for exemption from taxation is of the strictest kind, and so far have the decisions gone in this state that in Oklahoma City v. Shields, 22 Okla. 265, 100 P. 559, the court says, at page 293:

"Whoever insists that any particular property is not subject to the same burdens as imposed by law on the same character of property similarly circumstanced, has the burden of proof, and must make it clear that by contract or otherwise the property is beyond its reach. Claims of exemption from taxation must be plainly and unmistakably supported by express grant. It cannot exist by implication only. A doubt is fatal to the claim."

In the lower court, in the Central Coal & Coke Co. v. Carselowey Case, 40 Fed. (2nd.) 540, the court had occasion to refer to article 10, sec. 2, and also section 5 of the same article, which provided:

"The power of taxation shall never be surrendered, suspended, or contracted away. Taxes shall be uniform upon the same class of subjects."

Applying that to the present case, we find this situation: The landowner owns the land, out of which this oil and gas is being extracted. The Carter Oil Company, by grant from the landowner, acquires the right to extract the oil and gas therefrom, on a division of the product; so much to the landowner, and so much to the operator. The machinery necessary to extract this oil and gas, and the labor necessary to use the machinery, are furnished by the operator. The state needs revenue. It provides that the landowner, who has to bear the burden in the long run of killing of the surface by the deposit of saline and oily matters on it, pays 3 per cent. of what he gets out of the oil. It says also that the operator must pay 3

per cent. of what he gets. The privilege apparently is conferred on the operator of having the State Board of Equalization find out whether his taxes under the gross production are greater or less than they would be if the straight ad valorem property tax were visited on him. That privilege does not seem to be accorded to the landowner.

Under these conditions, the operator says that certain privileges of exemption are conferred upon him, so that he can escape taxes upon his property that he uses, not only in the actual operation, but everything incidental to it and remotely connected with it. The learned lawyers, that the operator has in its employ, say that this is a substituted tax, instead of an exemption. However, a rose by another name would smell just the same, and the "Ethiopian cannot change his skin, or the leopard his spots," and to play upon words does not help the matter, whether it comes from courts, or "amici curiae," or the lawyers in the case. The practical effect is that the owner of the land gets no exemption or privileges with reference to anything he has, but the operator does. "Is there no balm in Gilead, no physician there?"

If the Constitution means what it says, no exemption should be allowed, but it is clear that any exemption allowed in the statute must be strictly construed, and that the language must be explicit to allow an escape from taxation. Perhaps, by using the word "escape," as distinguished from the word "exemption," we might satisfy all effects of the word "substitution."

We are now very much engrossed in farm relief. For a long time our political friends have been devising a way to relieve the farmer. If the landowner in Oklahoma could "substitute" a 3 per cent. gross production tax in lieu of the ad valorem tax, there would be relief at once of some of the burdens that are holding down. There appears in the Kansas Farmer of a recent issue an article by United States Senator Arthur Capper, which begins as follows:

"A man I know farming 80 acres got $211 for what he sold off the land. His taxes are $161, leaving him $50 for his year's work."

Had a 3 per cent. production tax been applied to him, he would have paid out for taxes $6.33, whereas he paid $161. Senator Capper is not alone in his observation, because there are a great many in Oklahoma who did not get enough off the 80 acres to pay the taxes, much less the $50, though it was the reward of a year's labor. It is well known that the profits derived from some 80 acres of ground in this state, by virtue of extracting the oil from it, never to return, in a great many instances are hundreds of times more valuable than the land that is left destroyed for all practical purposes, to be a cripple in the economic development that is necessary to support the local population and future generations.

The inequality between oil and other subjects of taxation was strikingly illustrated several years ago in a cartoon in "The Cat," a paper formerly in circulation here. The cartoon was represented by two horses, their equipment, and riders. "Gross Production" was a "dapple gray," coat sleek and shining, who pranced along; "Ad Valorem" was a dusty hue, covered with grime, and breathing hard. "Gross Production" was ridden by a well-groomed, stiff and high-hatted rider, exquisite in dress, commanding in appearance, with satisfied mien. "Ad Valorem," unkempt, was led by one clothed in a garment of ancient look, with low head cover that had seen better days. "The Cat" is dead, but "Ad Valorem's" back is still straining.

The opinion in this case goes a very long way, as I take it. Very meager have been the announcements in this court, so far, that would help out the opinion in this case, as to the things other than the warehouse and the machinery in it. The statute does not support it; the Constitution is against it. There are a lot of cases cited in the opinion that are cited in the brief of the plaintiff in error, as establishing the very opposite of the conclusion of the court, with reference to the dwelling houses, the ice plant, the garage, and the hospital. There seems to be no authority whatever, justifying the opinion of the court in the ruling as to these. The statute is rather plain, so far as those features of the case are concerned. No one would seriously argue that a dwelling house was an indispensable agent in the drilling of an oil well, or that a garage had anything to do with it, and especially an ice house, unless, perhaps, that one might think that there was danger of getting so close to the nether regions that it was necessary to have ice to throw into the well to keep it from catching on fire. If a dwelling house, why not a bakery? If a bakery, why not a butcher shop? If a butcher shop, why not a beauty parlor, presided over by some fair one, or perhaps several such? If a dwelling, why not a mansion for the proprietor? As to the inaccessible country that is spoken of here, everybody concerned recognizes that there is no ground of apprehension or application.

As to the hospital, our law requires that hospitalization be furnished all injured employees of practically all classes of employers engaged in hazardous occupations.

In the brief of the defendant in error, it is claimed that in the application there is no exemption, but it is merely substitution, but the practical effect here is to hold that a dwelling house is a part of the machinery around the well, because men live in houses, and men produce oil by the use of machinery. The statute does not indicate any intention whatever, on the part of the Legislature, to give to the landowner any privileges. The operator should not have any more, as both pay the same kind of tax. If the farmer could pay 3 per cent. of what he raises, by way of substitution for taxes on land and equipment actually used in farming, what a paradise he would have, not to mention another substitute, i.e., on workstock!

It is very doubtful whether, in the light of the Constitution, there could be any abatement of taxes upon any of the casing or equipment in the well, or any of the machinery or appliances used around the well. Nobody could reasonably claim that a dwelling house, with a bath tub, constituted machinery. Nobody would claim that it would constitute an appliance, and nobody would claim that it was equipment of the well, or could be used for that purpose, except by radical modification or a complete change. The same way with the other articles. The only abatement of taxes, permitted by the statute, is upon the lease and upon the mining rights appertaining to the land, and upon the machinery, and upon the appliances and equipments used in the well, and the appliances and equipment around the well. Most clearly, none of the things come within the exception, and most clearly the action of the court below, in refusing to hold this property taxable, was erroneous.

The defining part, giving exemption upon things that are here sought to be exempted, is "machinery, appliances and equipment, used in and around any well * * * and actually used in the operation of such well." In the latter part, prescribing the proceeding for ascertainment by the State Board of Equalization of the comparative weight of the tax, the language is again used, "the machinery, equipment or appliances, used in the actual operation of, in, and around any such well or mine." It is not thought a hospital, or ice plant, or a dwelling house or garage could by any stretch of imagination be brought within the exempted class of property. No claim is made that exemption of this property, under the head of "Investment" is allowable. As applied to what, under the decision of this court, is subject to tax, i.e., the warehouse and contents thereof, there is less reason for exempting dwelling houses, ice plants, garages, and oil houses, than there is for exempting machinery on hand for the purpose of using it later.

Under our Constitution and our statute laws, there rests an obligation on the Carter Oil Company to pay taxes on all property assessed. This record certainly shows that it was not dealt with harshly by the taxing authorities of Carter county, either in getting property on the assessment list, or fixing its values. The lower court's dealing with it shows no desire to embarrass it. The equalization of the burdens of taxation is required by the dictates of natural justice, and its burdens now rest so heavily upon small landowners, that the ownership of land, ordinarily classed as one of the most potent factors in the building of citizenship, is now looked upon as a burden, rather than a benefit to be sought for.

Under these circumstances, it seems to me that this court should construe the statute so as to be fair to all. I do not think its construction of the statute is warranted either by its letter or spirit. I therefore register this dissent, in so far as the court affirms the action of the lower court.

LESTER, C. J. I desire to concur in the conclusion reached in the dissenting opinion of Mr. Justice Kornegay.