GULF REFINING CO. *v.* BD. OF SUPERVISORS OF
JASPER COUNTY.

March 1, 1954

No. 39123        55 Adv. S. 12        70 So. 2d 517

*James A. Boone, Harvey L. Strayhan, Irwin W. Coleman, Wright, Overstreet & Kuykendall,* Jackson; *Archie D. Gray,* Houston, Texas, for appellant.

*Matthew Harper, Jr.,* Asst. Atty. Gen., Jackson; *McFarland & McFarland,* Bay Springs, for appellee.

228

McGehee, C. J.

The Circuit Court of Jasper County affirmed an order of the board of supervisors thereof which assessed for ad valorem taxation three salt water disposal systems owned by the appellant Gulf Refining Company and used in the production of oil from wells that were owned and operated by the appellant in that county.

The assessment was for the year 1952 and at the July meeting of the board that year the appellant petitioned that this assessment be cancelled on the ground that the three salt water disposal systems were exempt from ad valorem taxation under the provisions of Section 9417-12, Code of 1942 as amended (Section 11, Chapter 134, Miss. Laws 1942), as producing oil equipment and appurtenances actually owned by, used and belonging to a producer of oil, gas and other minerals. The board of supervisors rejected this petition and there was an appeal to the circuit court where the cause was tried without the intervention of a jury.

The production of oil in the Heidelberg Field in Jasper County was begun by the appellant, as the original producer in said field in the year 1944. The undisputed testimony in the record discloses that in the early life of this field considerably more oil was produced than salt water, but that by the year 1950 considerably more salt water was being produced than oil. For instance, in the East Heidelberg Field by the year 1952 salt water production amounted to approximately 4,200 barrels per day as against the production of oil at approximately 2,800 barrels per day. In the West Heidelberg Field by January 1, 1953, the amount of 6,000 barrels of salt water were produced as against 2,200 barrels of oil. This salt water was being brought from the underground reservoir to the well-head, and was mixed with the oil and gas that was being produced from such reservoir.

It is obvious that some method had to be adopted for salt water disposal. Only two methods were avail-

able: (1) surface pits, which had proven wholly unsatisfactory in Mississippi on account of the temperature and humidity being such as to cause the salt water to evaporate from the surface pits too slowly, and with the result that the seepage from the pits was doing considerable damage to vegetation and was polluting fresh water streams; and (2) salt water disposal systems such as those sought to be taxed in this case.

A petroleum engineer testified for the appellant as an expert and explained that there are three major forces which bring about oil and gas production from the natural reservoir in the ground, and that they are (1) gravity drainage, (2) oil and gas expansion drive, and (3) water drive, the latter being characteristic in the Heidelberg Fields as the most effective force for oil and gas production. He explained that the water drive is the pressure caused by water in the reservoir, and that the salt water in the reservoir creates the pressure that brings it and the oil and gas to the surface in an unseparated mixture; and that the in-put well employed in one of the salt water disposal systems takes the salt water back into the formation from which the mixture came, and that this builds up pressure for the production of the residue of oil and gas in the underground natural reservoir. However, we do not base our decision on that factor in this case, but rather on the issue of whether or not all three of the salt water disposal systems are integral parts of the oil producing equipment or appurtenances owned and used by the appellant for the production of oil in the East and West Heidelberg Fields.

By a diagram introduced in evidence by this witness, he explained that the mixture of oil, gas and salt water which is forced up to the well head is carried from the well head through a pipeline for a short distance as an unseparated mixture into a steel vessel which separates the oil, gas and salt water by the application of heat thereto; and in this steel vessel the gas goes to the top thence

through pipes to the lease fuel system, and then when the heat is applied to the oil and salt water in the steel vessel underlying the gas the oil is separated from the water and goes to the lease stock tanks in the oil field, and that the salt water goes from the said steel vessel through a pipe leading to a filter which separates any residue of oil from the salt water and then through other parts of the salt water disposal pipelines on to the place of final disposal.

In other words, it is undisputed that it is just as essential to separate the salt water from the oil in order to make the latter marketable as it is to separate the gas and the oil.

It is at the lease tank located in the oil field that the gravity of the oil is determined and the severance tax calculated. It is at these tanks that the producer delivers the oil to the purchaser, and from which tanks it is transported through an oil gathering system to where it is to be shipped by rail or otherwise in interstate commerce by the purchaser. It is therefore essential that the salt water be separated from the oil before the severance tax can be determined on the basis of either 6c per barrel or 6% of the value of the oil.

The steel vessel hereinbefore referred to may be likened unto a large cylinder tank in a perpendicular position where the gas, oil and salt water are separated by the application of heat. The salt water when it leaves this steel vessel or tank to make room for the intake of other mixture of oil, gas and salt water from the well head, must be disposed of. There is no direct profit to be derived by the appellant in the disposal of this salt water. It predominates in quantity over the oil and gas. It can not be left suspended in midair outside of this perpendicular tank. The rules and regulations of the State Game and Fish Commission promulgated under the authority of Chapter 381, Laws of 1946, will not permit it to be placed in surface pits to damage vegetation and pollute streams by its seepage therefrom.

The only property involved in this suit is the system of pipes, filter and the in-put well from the point of connection with the steel vessel hereinbefore referred to; it does not include the pipes from the well head to the steel vessel, the steel vessel itself where the gas, oil and salt water are separated, the pipes from this vessel to the gas system, the pipes from the steel vessel to the oil lease stock tanks, nor the oil lease stock tanks. In other words, the assessment seeks to impose a tax on merely a part of a single unit used for the separation of the gas, oil and water and the transportation of each to their respective destinations on the leased premises. The situation presented would be analogous to the one that would arise if there was a statute exempting all equipment and appurtenances used for the manufacture of lumber for an exclusive specific purpose and the taxing authorities should attempt to assess the slab conveyor upon the theory that it is not used in the production of the lumber. In the instant case it is just as essential to dispose of the salt water as it would be to get slabs away from a circular saw in the production of the lumber. This salt water can not be allowed to remain in the steel vessel or cylinder tank after being separated from the gas and the oil respectively, since there is steadily flowing into this steel vessel or tank a mixture of gas, oil and salt water from the well head.

One of the expert witnesses testified, and his testimony is wholly undisputed, that: "If these systems were not in operation by the producer, large amounts of oil in this field, presently expected to be produced, would never be produced without the proper disposal of salt water because the production of salt water is necessary to the production of oil and when the pollution of salt water to surface lands becomes such that it must be prevented, the only choice is to shut down the production and thus the landowners, the State of Mississippi and the operator would lose much revenue that might other-

wise be realized through the proper disposal of produced salt water by the operator.

"In my opinion salt water disposal systems and salt water disposal wells are optional but necessary equipment to efficiently produce the wells so as to gain the greatest ultimate recovery of oil and at the same time protect lands from surface damage due to salt water. Salt water disposal systems are an essential part of the production equipment to accomplish this."

The following authorities should be compared as having some bearing on the question at issue: 51 Am. Jur., Taxation, Sec. 589, page 575; In Re Gross Production Tax Wolverine Oil Co., 53 Okla. 24, 154 Pac. 362, 366, L. R. A. 1916F 141; Going v. Shaffer, 213 Pac. 736, (Okla.); Josey Oil Co. v. Payne County, 107 Okla. 266, 231 Pac. 272; Carter Oil Co. v. Osage County, et al, 42 Pac. 2d 497; In Re Prairie Oil & Gas Co.'s Omitted Property Assessment List, 13 Pac. 2d 580; Board of Equalization of Carter County v. Carter Oil Co., 152 Okla. 99, 3 Pac. 2d 816, 77 A. L. R. 1060.

We are, therefore, of the opinion that these three salt water disposal systems are integral parts of the oil producing equipment and appurtenances thereto and that they are exempt from ad valorem taxation under Section 11, Chapter 134, Laws of 1944, being Section 9417-12 of the Mississippi Code of 1942 as recompiled, the pertinent part of which reads as follows: "All oil produced or under the ground on producing properties within the State of Mississippi and all producing oil equipment, including wells, connections, pumps, derricks and other appurtenances actually owned by and belonging to the producer, * * *, shall be exempt from all ad valorem taxes now levied or hereafter levied by the State of Mississippi, or any county, * * * or any other taxing district within this state. This exemption shall not apply to drilling equipment, including derricks, machinery, and other materials necessary to drilling, nor to oil gathering systems, * * *, but

all such drilling equipment, gathering systems, and lands shall be assessed as are other properties and shall be subject to ad valorem tax. * * *.''

The judgment of the circuit court which approved the ad valorem assessment of the three salt water disposal systems here involved is, therefore, reversed and such assessment thereof is hereby vacated.

Reversed and judgment here for the appellant.

*Lee, Holmes, Arrington* and *Ethridge, JJ.*, concur.