## In re ASSESSMENT OF OMITTED PROPERTY OF PRAIRIE OIL & GAS CO.

No. 20914. Opinion Filed July 27, 1932.

Chas. E. France, T. J. Flannelly, Paul B. Mason, and Burford, Miley, Hoffman, & Burford, for appellant.

Clarence Tankersley, Co. Atty., and Paul C. Thorn, Asst. Co. Atty., for Pottawatomie County and State of Oklahoma.

HEFNER, J. This is an appeal by the Prairie Oil & Gas Company, a corporation, from a judgment of the county court of Pottawatomie county in a tax ferret proceeding. The proceeding was instituted before the county treasurer by the ferret for the purpose of having placed upon the tax roll, as omitted property for the year 1928, a pump station and water line belonging to the above company. The treasurer sustained the proceeding and ordered the property assessed on an ad valorem basis as omitted property. The company appealed to the county court, where a trial de novo was had. The defense was that the pump station and water line were used in connection with a producing oil well, and that such use was actually necessary and indispensable in the production thereof. The trial resulted in judgment in

favor of the state. The oil company has appealed and asserts that the judgment is contrary to law. With this contention we agree.

There is no dispute as to the facts. Appellant was operating several producing wells. It had constructed a water pump station about seven miles from the lease being operated, and a water line was built from the station to the lease. The evidence shows that it was necessary to have and use the water in connection with the operation of the wells; that production could not proceed without the use of the water; and that water could not be obtained conveniently in sufficient quantity at a closer distance to operate the wells. Section 9814, C. O. S. 1921 [O. S. 1931, sec. 12434], after providing for the levy and collection of a gross production tax on oil, gas, and other minerals produced in this state, further provides:

"The payment of the taxes herein imposed shall be in full and in lieu of all taxes by the state, counties, cities, towns, townships, school districts and other municipalities * * * upon the machinery, appliances, and equipment used in and around any well producing petroleum or other crude or mineral oil or natural gas, or any mine producing asphalt, or any of the mineral ores aforesaid and actually used in the operation of such well or mine. * * *"

It is the contention of the state that the property involved is subject to an ad valorem tax for the reason that it was not used in or about the well; that the pump station was located in an adjoining county and about 7 miles distance from the operating wells; and that it is therefore not exempt from ad valorem taxation, notwithstanding the gross production tax, as provided by section 9814, supra, has been paid. In support of this contention, counsel rely upon the case of Going, County Treas., v. Shaffer, 89 Okla. 46, 213 P. 736. In our opinion, this case is not applicable to the facts here involved. In the cited case the producer and party seeking to exempt the property from ad valorem taxation was the owner of several hundred producing wells. Ten miles from these wells, he erected large steel storage tanks and pipe lines to convey the oil from the receiving tanks to the storage tanks. This court held that the pipe line and storage tanks were subject to ad valorem taxation notwithstanding the gross production taxes on the leases and oil produced therefrom had been paid. In rendering the opinion, the court said:

"Conceding that the evidence fully sustains the finding of the trial court, that these steel tanks and pipe lines were used exclusively by the plaintiff in producing and caring for the crude petroleum, we are of the opinion that the findings of the trial court and the testimony incorporated in the record do not show that these tanks were used in the operation of the oil wells, or that they were used in and around producing wells. As we have heretofore stated, there were small receiving tanks in and around the producing wells which were actually used in the operation of such wells; but after it was received in these small tanks, it was conveyed to the steel tanks, which are the subject of this controversy, to be cared for until it could be marketed. We do not think it was intended by the Legislature to exempt from the ad valorem tax property of this kind, and think that such property cannot be considered as coming within the provisions of the statute, which requires the property to be used in and around the producing wells, and to be used in the operation of such wells."

Under the facts there presented, it cannot be said that the pipe line and steel storage tanks were used in connection with producing wells and actually used in the operation thereof.

In the instant case, the well could not be operated without the use of water. The pump station and water line, under the evidence here presented, were used in connection with a producing well and actually used in the operation thereof. Under the plain provisions of the statute, the property here involved was exempt from ad valorem taxation where the gross production tax was paid upon the oil produced.

In the case of In re Gross Production Tax Wolverine Oil Co., 53 Okla. 24, 154 P. 362, this court, speaking on the question of the kind and character of equipment and machinery exempt from ad valorem taxation under section 9814, supra, said:

"The equipment and machinery referred to is confined to that used in the actual operation of producing wells, hence does not include equipment and machinery on hand, and not so used. By the act a tax is levied based upon the value of the gross production. This can only arise through the discovery and production of oil or gas. The equipment and machinery owned by the producer, and which is an indispensable agency in the discovery and production of the commodity, forms a part of the property out of which the production arises. Without it production is impossible. The same is not taxed directly, neither are the lands or leases, where the production is through a lessee."

To the same effect is the case of Board of Equalization of Carter County v. Carter Oil Co., 152 Okla. 99, 3 P. (2d) 816. It is there held that property and equipment

which is an indispensable agency in the discovery and production of oil and used in and around a producing well and actually used in the operation of the well is exempt from ad valorem taxation.

In our opinion, the evidence in this case shows that water for the operation of the wells was an indispensable agency in the operation of the wells for oil and gas purposes; and that the source of supply could not be had at a nearer point. In reference to these two points, the evidence is as follows:

"Q. What was the purpose of the construction of the pump station herein involved? A. In order to get water to operate our leases. Q. What leases, just briefly refer to them by name and location, do you refer to? A. The Otis Graham, in section 10, 9, 5, Seminole county; the Charley Graham, section 3, 9, 5; the Ruth Stidham, in section 11, 9, 5; and Charley Davis, in section 13, 9, 5. Q. Do you know, Mr. Newport, the number of producing wells upon the leases you have named, on January 1, 1928? A. About 20, I believe. Q. About 20 producing wells upon those leases at that time? A. About, yes, sir. * * * Q. I will ask you to state whether or not it is necessary to have water for drilling wells, and for the production and pumping of oil from the wells? A. Yes, sir, it is. Q. How many barrels of water per day are required for each producing well? A. About 25 barrels. Q. And that much was required for each of these 20 wells upon the leases you have referred to? A. That were producing, yes, sir? * * * Q. How are these wells pumped, how is the oil pumped out of them? A. By air lift. Q. Is water required for that purpose? A. Yes, sir. Q. How many air lifts do you use for these particular wells? Mr. Lewis: I would like for you to state the time of your question. Q. As to January 1, 1928? A. There were four, one on each lease. Q. I will ask you to state whether there was water available on the leases in question on January 1, 1928, for these purposes? A. No, sir; there was not. Q. Is there water available there now? A. No, sir. Q. State what efforts you have made to obtain water to be used in the production of oil from these leases, as of January 1, 1928? * * * Q. (By Mr. France): State, Mr. Newport, whether or not there is a water supply available for use in producing oil from the wells on these leases in question, and whether or not there was water available for that purpose on January 1, 1928, at a nearer point than the place where this pump station is constructed? * * * A. No, sir; there wasn't. The supply that we would have to have was not available nearer. Q. As a matter of fact, this pump station involved here was constructed at the nearest available water supply? A. Yes, sir. Q. State generally, Mr. Newport, why it is necessary to have water in the production of the oil from these leases which you have enumerated? A. In an air lift station you have to have water to cool the gas or gas which you might use between the two stages, and in the water jackets of your engine, and the same on a pumping well, or a gas engine used to pull tubing the water jackets require water. Q. Are all of the wells upon the lease in question and were said wells on January 1, 1928, pumped by air lift? A. Yes, sir. Q. Is it possible to pump the wells without the water supply? A. No, sir; you couldn't do it without water; you couldn't run your machinery. Q. This may be a repetition, but how much water per day is required for an air lift station? A. On those stations there, small ones, it will run from 1,500 to 1,700 barrels per station, and on the larger stations it will run into 2,000 barrels per day. Q. What was the type of stations on these leases? A. On the Stidham we had 185 horse-power units. Q. Was that the largest station? A. Yes, sir. Q. What is the required amount of water per day for that station? A. About 2,000 barrels. Q. What were the types of the other stations? A. They were 90 horse power. Q. They used about how much water per day? A. Fifteen hundred to seventeen hundred barrels. * * * Q. What was the source of those water supplies you used from sections 28 and 13? A. Just ponds. Q. Did you exhaust that supply? A. Yes, sir."

It seems clear to us that this evidence establishes that water is an indispensable agency in the operation of the wells in question, and that a sufficient supply could not be had at a nearer point. In fact there is not a line of evidence in the record to the contrary.

This being true, in our opinion, the property in question was not subject to ad valorem taxation for the year 1928. The judgment is reversed and the cause remanded, with directions to dismiss the proceedings.

RILEY, CULLISON, SWINDALL, ANDREWS, and McNEILL, JJ., concur. KORNEGAY, J., dissents. LESTER, C. J., and CLARK, V. C. J., absent.

---

KORNEGAY, J. (dissenting). I cannot agree with the view as expressed by the majority opinion in this case. The syllabus appears to express the facts fairly well. The appellant is the Prairie Oil & Gas Company, and the appeal is to exempt from taxation property that was put on the rolls by the tax ferret and assessed at $12,500. The treasurer sustained the proceeding. The county court sustained the proceeding, and the oil company appeals.

The water pump station was about 7½

miles from the wells that were operated and the water line was built from the station to the wells. As to the evidence showing that water was necessary in the operation of the oil well, perhaps the court would take judicial knowledge of the fact that in some cases water is needed in and around a well. So, also, is casing, tubing, and machinery.

As yet the claim has not been made under the Oklahoma statute that a company drilling for oil could erect a casing factory and equipment to produce and transport oil well machinery, and could claim taxation exemption for such under the guise of gross production substitution. If the decision to exempt a plant to supply water generally is the law, there is very little room for stopping a decision for the erection of a tax exempt refinery for the purpose of supplying lubricant for the machinery. The deduction is made, from the language of the act, that the Prairie Oil & Gas Company can claim this distant pump station as exempt, the language of the act relied on for exemption being contained in the Session Laws of 1916 (Ex. Sess.) c. 39, sec. 1 [O. S. 1931, sec. 12434], as follows:

"Every person, firm, association or corporation engaged in the mining or production within this state of asphalt or of ores bearing lead, zinc, jack, gold, silver or copper, or of petroleum or other crude oil or other mineral oil or of natural gas, shall within 30 days after the expiration of the quarter-annual period ending on the last day of March, A. D., 1916, and of each quarter-annual period thereafter expiring respectively, on the last day of June, September, December and March of each year, file with the State Auditor, a statement under oath, on forms prescribed by him showing the location of each mine or oil or gas well operated by such person, firm, corporation or association during the last preceding quarter-annual period; the kind of such mineral, oil or gas produced; the gross amount thereof produced, and the actual cash value thereof at the place of production; the amount of the royalty payable thereon, if any, to whom payable and whether it is claimed that such royalty is exempt from taxation by law, and the facts on which such claim of exemption, if any, is based; and such other information pertaining thereto as the State Auditor may require, and shall at the same time pay to the State Auditor a tax equal to one-half of one per centum of the gross value of asphalt and of ores bearing lead, zinc, jack, gold, silver and copper produced, less the royalty interest, and equal to three per centum of the gross value of the production of petroleum or other crude or mineral oil and of natural gas, less the royalty interest. The owner of any royalty interest shall pay to the State Auditor the tax herein imposed upon such royalty interest within the time and in the manner provided by this act.

"The tax hereby declared shall also attach to and is levied on what is known as the royalty interest except such royalty interest of the state of Oklahoma or such royalty interests as are exempted from taxation under the laws of the United States and the amount of the tax on the royalty interest shall be a lien on such interest.

"The State Auditor shall have power to require any such person, firm, corporation or association engaged in mining or the production of such asphalt, mineral ores aforesaid, petroleum or other crude oil or other mineral oil and natural gas or owner of any royalty interest therein to furnish any additional information by him deemed to be necessary for the purpose of correctly computing the amount of said tax and to examine the books, records, and files of such person, firm, corporation or association and shall have power to examine witnesses, and if any witness shall fail or refuse to appear and testify at the summons or requests of the State Auditor, said State Auditor shall certify the facts and the name of the witness so failing and refusing to appear and testify or to produce any book, record or file to the district court of this state having jurisdiction of the party, and said court shall thereupon issue a summons to said party to appear and give such evidence and produce such books, records and files as may be required and upon failing to do so, the offending party shall be punished as provided by law in cases of contempt.

"The State Auditor shall have power to ascertain and determine whether or not any return herein required is a true and correct return of the gross products and of the value thereof of such person, firm, corporation or association engaged in the mining or production of asphalt and ores bearing minerals aforesaid and of petroleum or other crude oil or mineral oil and of natural gas, and if any person, firm, corporation or association has made an untrue or incorrect return of the gross production or value thereof, as hereinbefore required, or has failed or refused to make such return, the said State Auditor shall ascertain the correct amount of either, and compute said tax.

"The payment of the taxes herein imposed shall be in full and in lieu of all taxes by the state, counties, cities, towns, townships, school districts and other municipalities upon any property rights attached to or inherent in the right to said minerals, upon leases for the mining of asphalt and ores bearing lead, zinc, jack, gold, silver or copper or for petroleum or other crude oil or other mineral oil, or for natural gas upon the mining rights and privileges for the minerals aforesaid belonging or appertaining to land,

upon the machinery, appliances and equipment used in and around any well producing petroleum or other crude or mineral oil or natural gas, or any mine producing asphalt, or any of the mineral ores aforesaid and actually used in the operation of such well or mine; and also upon the oil, gas, asphalt or ores bearing minerals hereinbefore mentioned during the tax year in which the same is produced, and upon any investment in any of the leases, rights, privileges, minerals or property hereinbefore in this paragraph mentioned or described; but any interest in the land other than that herein enumerated, and oil in storage, asphalt, and ores bearing the minerals hereinbefore named, mined, produced and on hand at the date as of which property is assessed for general and ad valorem taxation for any subsequent tax year shall be assessed and taxed as other property within the taxing district in which such property is situated at the time.

"The State Board of Equalization, upon its own initiative, may, and upon complaint of any person who claims that he is taxed too great a rate hereunder, shall, take testimony to determine whether the taxes herein imposed are greater, or less than the general ad valorem tax for all purposes would be on the property of such producer subject to taxation in the district or districts where the same is situated, including the value of oil, gas or mineral lease, or of the mining or mineral rights, the machinery, equipment or appliances used in the actual operation of in and around any such well or mine, the value of the oil, gas, asphalt or any of the said mineral ores produced and any other element of taxable value in lieu of which the tax herein is levied. The said board shall have power and it shall be its duty to raise or lower the rates herein imposed to conform thereto. An appeal may be had from the decision of the State Board of Equalization thereon, by any person aggrieved, to the Supreme Court, in like manner and with like effect as provided by law in other appeals from said board to said court; provided, that after such tax has been collected and distributed, or paid without protest, no complaint with reference to rate thereof shall be heard or considered."

It appears that the pump station was not only not in the county, but was 7½ miles away. The state cited the case of Going, Co. Treas., v. Shaffer, 89 Okla. 46, 213 P. 736, a tank case, the tank located several miles away, and distinction is undertaken to be made in the majority opinion. Regardless of that case, the statute is plain and the language of it is plain. To say that the case held that pipe lines and steel storage tanks were not in and around a well, would be to assert the truth, which is similar to the present case. Suppose the Prairie Oil & Gas Company had only one well, and by virtue of the production therefrom and the paying of a gross production tax thereon sought to exempt itself from ad valorem taxation in this case, would the opinion be as it is?

The case of In re Gross Production Tax Wolverine Oil Co., 53 Okla. 24, 154 P. 362, is relied on and quotation taken therefrom, and also the case of Bd. of Equalization of Carter Co. v. Carter Oil Co., 152 Okla. 99, 3 P. (2d) 816. An inspection of that opinion shows that it held subject to ad valorem taxation material right at hand, and on the lease, that was necessary for, not only the operation of the wells there, but elsewhere, and that it was necessary also to have ready at hand there in storage to prevent delay in ordering machinery from elsewhere, and break-downs in operation.

As I view the matter, the limit has been reached in this case, and overreached, in finding a way to exempt from taxation those most able to pay, for whose protection the police power of the state is every day applied. The landowner gets no reduction. The operator does. This opinion extends the statutory exemption. I think it disregards the plain wording of the statute and nullifies the qualifying words. One qualification is that it must be either in or around a producing well. Most clearly it could not be said that this pumping station, 7½ miles away, was around any well or in it, that was producing petroleum. Neither could it be said that this is machinery that is actually used in the operation of a well. An oil well, at the most, as we generally find it, is a hole varying from 8 inches to two feet at its upper part. The exemption of what was found in such a place would be simple. The exemption of machinery around such a place and actually used in operation would require a very simple inspection. The exemption of what is around it here is enlarged to 7½ miles by judicial construction.

It is true that there may be machinery several miles away that would pump the water and the water might be used for operation purposes, but that is quite apart from the qualification requirement made by this statute. Again, we must remember that there is somewhat of a stretch of constitutional provisions to allow this so-called substitution tax to bring about an exemption on property that under the plain requirement of the Constitution is subject to taxation in a different county, a taxing unit. The principle of strict construction of tax exempting statutes appears to be generally recognized.

I do not think the cases cited bear out the conclusion here reached. However, this case is but another one of the steps in the series by which courts have gotten away from statutes, and by which litigants have succeeded in getting decisions and constructions that, had there been no precedents fashioned on the lines of the "Tower of Pisa," would be startling, and recognized as very much out of line by the normal person.

As applied to an opening no bigger than the ordinary well, the term "around," used in connection with the term "in," certainly carries the idea of close proximity. As here used, "around any well producing petroleum" shows a reference to what is used for the particular well and belonging to it alone, unless we disregard the meaning of "around," as defined by the ordinary dictionary. It would be an anomaly to say that one who wrapped the folds of his cloak around him for protection from the weather could effectively use a cloak 15 miles in diameter, or that the ordinary lad, when told to rake up the debris around the doorway, would be justified in going into the adjoining county to start the work of cleaning. One would scarcely argue that a party owning waterworks, who supplied water to an oil operator, was using the pumping plant in the operation of an oil well by reason of impounding and transporting the water that was used by the oil operator in his operations, or that he was employing his pumping machinery "in the actual operation of, in and around any such well."

As I view it, the language used by the Legislature is not susceptible of the construction placed thereon in the majority opinion. I therefore register this dissent.